**EXHIBIT B**

**Page 1**

```
                FOR THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DIVISION OF OHIO
                          EASTERN DIVISION
                                                    COPY

SANDRA SCHILLING, et al.,

    Plaintiffs,

vs.                        CASE NO:  C2-06-487

INTERIM HEALTHCARE OF THE
UPPER OHIO VALLEY, et al.,

    Defendants.
```

        The deposition of DIANE LYNN HUNTER was taken
upon oral examination pursuant to Notice and
pursuant to the Federal Rules of Civil Procedure,
before Regina L. Bryant, Court Reporter and Notary
Public in and for the State of West Virginia,
Tuesday, October 23, 2007, at 12:50 P.M., at
McArdle Law Office, 80 12th Street, Suite 206,
Wheeling, West Virginia.

                    BRYANT COURT REPORTING, LLC
                         1829 Winding Drive
                        Coshocton, OH  43812
                           (740) 623-9860

**Page 2**

APPEARANCES

Counsel on Behalf of the Plaintiffs:
FIELDS, DEHMLOW & VESSELS, LLC
Ethan Vessels, Esquire
309 Second Street
P.O. Box 170
Marietta, OH  45750
(740) 374-5346

Counsel on Behalf of the Defendants:
McARDLE LAW OFFICE
Elgine McArdle, Esquire
80 12th Street
Suite 206
Wheeling, WV  26003
(304) 232-0700

**Page 3**

EXAMINATION INDEX

DIANE LYNN HUNTER
    BY MR. VESSELS                                    4

EXHIBIT INDEX

Defendant's Exhibit No.                          MARKED

1    Supervisory Meeting Minutes of        50
     September 13, 2004

2    Fax Cover Sheet and Letter to Dan       61
     Riston

3    September 22, 2004 Meeting Minutes      63

4    Asset Purchase Agreement                74

5    Management Services Agreement           88

6    Bill of Sale                            92

7    January 28, 2005 Letter                101

8    Resignation                            105

9    July 8, 2005 Letter                    116

**Page 4**

DIANE LYNN HUNTER, DEPONENT, SWORN

EXAMINATION

BY MR. VESSELS:

    Q.  Good afternoon.  My name is Ethan Vessels.
Again, I represent the plaintiffs in this case,
Sandra Schilling and Janet Boyce and their
families.

        Have you ever given a deposition before?

    A.  Yes.

    Q.  And how many times have you given

depositions?

    A.  Twice.

    Q.  Have you been given the standard

instructions on how to respond to questions in a

deposition?

    A.  Basically, yes.

    Q.  You know to give verbal responses rather

than nods of the head?

    A.  Yes.

    Q.  It's hard for the court reporter to take

down uh-huh or uh-uh, so if you could remember to

say yes or no.  If you don't know the answer to

something, that is a perfectly acceptable response.

I prefer to know that you don't know rather than

hazard a guess.  You mentioned that --

5

1 Why don't we go ahead and get your full
2 name for the record, please.
3 A. Diane Lynn Hunter.
4 Q. And you've mentioned you had been in a
5 deposition two other times?
6 A. Uh-huh.
7 Q. What types of cases were those?
8 A. The first one was my neighbor had a
9 problem with a surgical procedure, so I was called
10 in on that. And the last one was --
11 THE DEPONENT: Gosh, the one we just did.
12 A. I can't remember.
13 MS. McARDLE: Noncompete.
14 A. Oh, yeah. It was a noncompete.
15 Q. That was in your role with Interim Health
16 Care?
17 A. Yes.
18 Q. How recently was that?
19 A. Two months ago.
20 Q. Who was the other health care agency on
21 that?
22 A. Maxim.
23 Q. Okay. You had an employee that left to go
24 to them or --
25 A. They were taking my employees.

6

1 Q. I understand. Are you married?
2 A. Yes.
3 Q. What's your husband's name?
4 A. Bradford.
5 Q. How long have you been married?
6 A. Since 1977.
7 Q. What is your occupation?
8 A. I'm a registered nurse and the owner of
9 Interim Health Care of Southeast Ohio.
10 Q. I would like to briefly get your
11 educational background.
12 Did you graduate from high school?
13 A. Yes.
14 Q. Where did you go to high school?
15 A. Shaler High School in Pittsburgh.
16 Q. Did you go to college?
17 A. Yes.
18 Q. Where did you go to college?
19 A. Thomas Nelson in Virginia.
20 Q. Did you get a bachelors degree?
21 A. No. Associate.
22 Q. What was the associate's degree in?
23 A. Nursing.
24 Q. Is that when you got your registered --
25 A. Yes.

7

1 Q. And when did you become a registered
2 nurse?
3 A. 1981 or '82.
4 Q. Is that a certification that's done by
5 state?
6 A. It's a licensure through the state.
7 Q. Okay. Are you a licensed nurse in Ohio?
8 A. Yes.
9 Q. And West Virginia?
10 A. Yes.
11 Q. Other states?
12 A. No.
13 Q. And let's just jump right into the home
14 health care business.
15 How did you come to be involved in the
16 home health care business?
17 A. I applied at Williamsburg Community
18 Hospital years ago and just applied as a field
19 nurse and took on a position there and then was
20 promoted to Director of Nursing at the hospital's
21 facility.
22 Q. When was that?
23 A. 1980's.
24 Q. And that involved you doing in-home type
25 health care?

8

1 A. Yes.
2 Q. How did you know Lance Blankenship?
3 When did you meet him?
4 A. We moved up here and I applied in 1993 at
5 Interim Health Care.
6 Q. So Interim Health Care is a business that
7 had already been going on?
8 A. He -- I came on in November of '93 and he
9 started in April of '93.
10 Q. Okay. Started as what?
11 A. As Interim Health Care of Upper -- as
12 Interim Health Care, as far as I know.
13 Q. Okay. Well, let's back up a little bit.
14 I presume you just didn't go into business
15 with somebody you didn't know; right?
16 A. I didn't go into business right then.
17 Q. Okay. That's what I'm trying to get at.
18 You came to Wheeling?
19 A. We actually lived in West Alexander,
20 Pennsylvania.
21 Q. Okay. So in this upper Ohio valley area?
22 A. Yes.
23 Q. Was there already a company called Interim
24 Health Care of the Upper Ohio Valley?
25 A. No.

DEPOSITION OF DIANE LYNN HUNTER

9

1 Q. When was it formed?

2 A. I'm not sure of the date.

3 Q. That's okay. Early nineties for sure?

4 A. Uh-huh.

5 Q. That's a yes?

6 A. Yes.

7 MS. McARDLE: Just for the record, are we

8 talking about Interim that Lance Blankenship

9 started in '93 or Interim Health Care of the Upper

10 Ohio Valley?

11 MR. VESSELS: Thank you for the

12 clarification. I did not know that there was a

13 difference.

14 Q. Please, is there a difference?

15 A. When I applied it was Interim Health Care

16 and then --

17 Q. Of the Upper Ohio Valley?

18 A. No.

19 Q. Okay.

20 A. He incorporated a couple years after that

21 with some investors.

22 Q. Did he -- was there -- who owned the

23 Interim Health Care when you first got here?

24 A. He did, he and his wife.

25 Q. Had anyone owned it before then?

10

1 A. No.

2 Q. And it was just called Interim Health

3 Care?

4 A. Yes.

5 Q. Did it have any words after it?

6 A. No.

7 Q. Was it a part of a larger franchise

8 operation?

9 A. It was a franchise.

10 Q. Interim Health Care is a national

11 franchise?

12 A. Yes.

13 Q. And he was operating one of their

14 franchises local?

15 A. Yes.

16 Q. But he had not incorporated at that point?

17 A. No.

18 Q. So at this point in the early nineties,

19 whenever it was, he was operating an unincorporated

20 Interim Health Care business?

21 A. Yes.

22 Q. And you came to the area?

23 A. Yes.

24 Q. And you worked for him?

25 A. In November of '93.

11

1 Q. In what capacity were you working for him?

2 A. Director of Nursing.

3 Q. What's that mean?

4 A. You're just in charge. I was the only

5 nurse there. It was small, so I was in charge.

6 There was seven patients and I was in charge of

7 admitting the new clients and then did a little bit

8 of marketing and had taken care of their health

9 care needs.

10 Q. So he hired you as an employee at that

11 point?

12 A. Yes.

13 Q. And you were the Director of Nursing

14 Operations?

15 A. Yes.

16 Q. Were there any other employees at that

17 point?

18 A. There was a secretary, there was an

19 accounts payable, himself and some aides and I

20 think one or two nurses.

21 Q. Did you actually go out to homes of

22 patients and help take care of them?

23 A. Yes.

24 Q. Did you also supervise other people that

25 would go out and take care of patients?

12

1 A. Uh-huh.

2 Q. That was a yes?

3 A. Yes.

4 Q. Did -- if you know, how did Lance

5 Blankenship come to be in the home health care

6 business?

7 A. I don't know. I think he had told me that

8 he just -- the corporate office ran an ad in the

9 paper. They were trying to expand franchises and

10 he responded to the ad.

11 Q. Does he have any nursing background?

12 A. No.

13 Q. So he was doing it as an entrepreneurial

14 venture?

15 A. I can't answer that. I don't know.

16 Q. He was doing it as a businessman?

17 A. Yes.

18 Q. How long had he been operating before you

19 came on board?

20 A. His franchise was approved in April of '93

21 and I came on in November of '93.

22 Q. Oh, okay. So you were there from the

23 beginning?

24 A. Not from the beginning.

25 Q. Almost the beginning?

13

1    A. Yes.

2    Q. He hadn't been in business very long

3  before you got there?

4    A. Yes.

5    Q. And he interviewed you as he would any

6  employee for your experience and qualifications?

7    A. Yes.

8    Q. He needed someone that had a background in

9  the business of nursing and in-home nursing

10 specifically; right?

11   A. Yes.

12   Q. When was the corporation Interim Health

13 Care of the Upper Ohio Valley, Inc. formed?

14   A. I'm not sure of the exact date, but I

15 think that it was in 1995.

16   Q. Okay. So this was at least a couple years

17 after you'd been there?

18   A. Yes.

19   Q. And from here on out, for the purposes of

20 simplicity, as we have in our briefs, I'll just

21 refer to Interim Health Care of the Upper Ohio

22 Valley as UOV.

23   A. Yes.

24   Q. And when we talk about Interim Health Care

25 of Southeast Ohio later on in the deposition I'll

14

1  just refer to that as SEO, okay?

2    A. Yes.

3    Q. With regard to UOV in 1995 when you

4  incorporated, whose idea was it to incorporate?

5    A. His with some -- he had investors. I was

6  a typical clinical nurse. I just did nursing at

7  that time.

8    Q. You weren't involved in the business

9  decisions?

10   A. No.

11   Q. Did Lance Blankenship contribute any

12 capital to the company?

13   A. I don't know.

14   Q. But you know he had investors as well?

15   A. Yes.

16   Q. Do you know who they were?

17   A. Uh-huh.

18   Q. That's a yes?

19   A. Yes.

20   Q. And who were they?

21   A. Bill Mettivick, Nick Sparshane. I can't

22 remember all of them. I think there were three or

23 ir.

24   Q. Did Lance Blankenship own shares of the

25 company at that point?

15

1    A. I don't know.

2    Q. Do you know if those other investors owned

3  shares in the company at that point?

4    A. I don't know.

5    Q. At the very beginning of the corporation

6  UOV, what was Lance Blankenship's title?

7    A. The owner.

8    Q. Because of the corporation would he be

9  considered the CEO?

10   A. CEO or president.

11   Q. President of the corporation UOV?

12   A. Yes.

13   Q. He was in charge of all the operations?

14   A. Yes.

15   Q. Did you have shares in UOV at that time?

16   A. No.

17   Q. Did you ever come to have shares of UOV?

18   A. Yes.

19   Q. When?

20   A. I believe 1996. I'm not sure of the exact

21 date of that.

22   Q. So about a year after he incorporated UOV

23 you came to have shares?

24   A. We never actually had a shares

25 certificate. We just had paperwork.

16

1    Q. And true, I understand what you mean.

2       You indicated that you had an ownership

3  interest in the business?

4    A. Yes.

5    Q. And what was the reason that you -- how

6  did you come to get those shares of the business?

7    A. Because the investors pulled out and he

8  needed some more cash and I was working 70 hours,

9  80 hours a week and felt that I should have some

10 partnership in it.

11   Q. Did you give money for these shares?

12   A. $25,000.

13   Q. What percentage of the company did that

14 give you?

15   A. 15 percent.

16   Q. Now, were these shares all in your name or

17 did you and your husband have shares?

18   A. They were combined, me and my husband.

19   Q. So the shares literally said Diane Hunter

20 and Brad Hunter?

21   A. Yes.

22   Q. So it's not like you had seven and a half

23 percent and Brad had seven and a half?

24   A. No.

25   Q. So sometime in 1996 you became a 15

17

1  percent shareholder of the business?
2      A. Yes.
3      Q. Did you get a title with that?
4      A. No.
5      Q. Were you named vice-president of the
6  company?
7      A. Not at that time, no.
8      Q. Why did the investors pull out?
9      A. I don't know the exact reason.  I know
10  that Bill Mettivick, I had heard this, that he said
11  he wasn't comfortable with what was going on.
12      Q. Just, I'll say it, hearsay from what you
13  know?
14      A. Yes.
15      Q. You say you were not vice-president at
16  that time?
17      A. No.
18      Q. 1996?
19      A. No.
20      Q. Did you become vice-president at some
21  point?
22      A. Yes.
23      Q. When?
24      A. Probably 2003.
25      Q. Why did you become vice-president at that

18

1  time?
2      A. Just because we had hired Paula Frollini
3  as the Director or Nursing and she was helping to
4  oversee some of the offices.
5      Q. How many offices did the company have?
6      A. We had three.  Well, we had three.  We had
7  four at one time.  We had a Steubenville office and
8  then he closed that.
9      Q. Okay.  Where were the three offices?
10      A. Bridgeport, Wheeling, West Virginia and
11  Marietta.
12      Q. During your time at the company from 1993
13  through 2003, let's say, the first 10 years, how
14  was the business going?
15      A. Very well.  It was growing.
16      Q. Growing business?
17      A. Uh-huh.
18      Q. Did you increase the number of employees?
19      A. Yes.
20      Q. By how many?
21      How many did you have by 2003?
22      A. Oh, probably around 210.
23      Q. So you went from in 1993 just you and a
24  few other clerical staff to 210 employees?
25      A. Yes.

19

1      Q. Did the money revenue increase during
2  those years?
3      A. Yes.
4      Q. Was it a profitable business?
5      A. We were making money.
6      Q. Was Lance Blankenship doing well because
7  of this business?
8      A. Yes.
9      Q. Were you doing well because of this
10  business?
11      A. I was getting a paycheck every week.
12      Q. You got a paycheck, you got a salary?
13      A. I got a salary.
14      Q. Did you not also share in the profits as a
15  shareholder?
16      A. I did not get any dividends or money.
17      Q. What was the purpose of owning shares of
18  the company if you didn't get --
19      A. Because I just wanted him to sell the
20  business to me when he was done.
21      Q. What do you mean when he was done?
22      A. When he wanted to retire.
23      Q. How old was he in 2003 let's say?
24      A. In 2003, maybe 50.
25      Q. Was there already some type of intent or

20

1  had he ever indicated to you that he wanted to
2  retire?
3      A. He always said that he would sell the
4  business to me.
5      Q. So -- I'm trying to get to the core of why
6  you wanted the shares if you didn't get any profit
7  out of it.
8      A. Because I knew eventually that I may get
9  some profit out of it.
10      Q. I mean, if he has 85 percent of the shares
11  and you have 15 percent of the shares, when you
12  have a really good year, and let's say a million
13  just for our purposes, and I know that may not be a
14  right number, why then would you not get $150,000
15  of the net profit at the end of the year?
16      A. Because there wasn't money at the end of
17  the year to.
18      Q. At any year, was there never a good year
19  at that point?
20      A. No.  We were always in the negative.
21      Q. I thought you said the revenues were going
22  up?
23      A. They were.
24      Q. And that you were hiring more employees?
25      A. Yes.

DEPOSITION OF DIANE LYNN HUNTER

21

1   Q. Business was busy?
2   A. Yes.
3   Q. Lance was making money?
4   A. Yes.
5   Q. And yet at the end of the year it was
6   always negative?
7   A. Yes.
8   Q. Did you ever go to Lance and say, "We are
9   doing all this business, where is the money?"
10  A. Yes.
11  Q. And what did he say?
12  A. He said, "It's my business, I'll do what I
13  want with it."
14  Q. Even though you were a shareholder?
15  A. Yes.
16  Q. Did you ever think about forcing the issue
17  at any point?
18  A. Yes.
19  Q. And what did you do?
20  A. Well, we have had several arguments over
21  it.
22  Q. Give me some time frames, not right down
23  to the day, but --
24  A. Years?
25  Q. Yeah, just --

22

1   A. I don't know. That would be guessing.
2   But throughout the time, you know.
3   Q. So let's say 2000. You have been a
4   shareholder for four years now and business is
5   increasing and more employees are coming.
6       Did you ever go to him and say, "Where is
7   my share?"
8   A. No. I never went -- at that time I didn't
9   go and say, "Where is my share," because we needed
10  the money. We were continually growing, so I knew
11  the money was going back into it.
12  Q. Into the business?
13  A. Uh-huh.
14  Q. Reinvesting the profits?
15  A. Yes.
16  Q. Was Lance living a good lifestyle during
17  the same period?
18  A. Yes.
19  Q. And yet you weren't getting anything more
20  than your regular salary?
21  A. Correct.
22  Q. What was your regular salary?
23  A. I started off at I think 32 or 33,000 a
24  year and ended up at 80,000.
25  Q. By 2004 you were at 80,000?

23

1   A. Yes.
2   Q. But never any type of dividend or
3   distribution of profits?
4   A. Not during that time.
5   Q. Okay. Well, when did you have the
6   arguments then?
7       When did you -- give me just any kind of
8   ball park. When did you go to him and say
9   something?
10  A. Probably around 2003 we had a couple
11  arguments. He had a company, a consulting group,
12  come in and try to help him out. And he was
13  spending 20,000 a month for this consulting group.
14  So that was an argument, you know, "Why are you
15  having to spend all that much money when we could
16  use it elsewhere?"
17      Another time I had gone up, because the
18  person that was in charge of the consulting firm
19  was talking to me, and just said, "You got to get
20  him to quit take money out of the account."
21  Q. The consultant told you that?
22  A. Yes.
23  Q. Told him to stop taking out of the
24  account?
25  A. Yes.

24

1   Q. He was taking out of the till?
2   A. Yes. So I went in his office and told
3   him, you know, that -- you know, he has to stop
4   taking out this because we've got all these bills and
5   we need to pay taxes or whatever else is due. And
6   he got really angry and told me that I wasn't being
7   a loyal employee.
8   Q. Even though you weren't his employee, were
9   you?
10  A. Well, he treated me as an employee.
11  Q. But you weren't, were you?
12      You were an owner of the business.
13  A. I felt as an employee.
14  Q. So there is a definite power imbalance
15  there between you and Lance Blankenship?
16  A. Yes.
17  Q. So in 2003 is when things started coming
18  to a head?
19  A. 2003, 2004 was really bad.
20  Q. And you learned from these consultants
21  that Lance was pilfering from the business?
22  A. Yes.
23  Q. Taking more than what would be his share
24  even if he owned 100 percent of the shares?
25  A. Yes.

DEPOSITION OF DIANE LYNN HUNTER

25

1  Q. Couldn't pay the bills?
2  A. Correct.
3  Q. And this was in 2003 when you learned
4  that?
5  A. Yes.
6  Q. Now, I haven't marked it, but I read you
7  the affidavit that you attached to your Motion for
8  Summary Judgment. And it said, "From November 1,
9  1993 until August 29, 2004 I was the Director of
10 Health Care Services of Interim Health of the Upper
11 Valley, Inc." Is that correct?
12 A. Yes.
13 Q. What does that mean, Director of Health
14 Care Services?
15 A. Same thing as Director of Nursing, just
16 being in charge of the clients and do organization.
17 Q. Would it be fair to say that during that
18 time you would be what we would call the chief
19 operating officer of the company?
20    MS. McARDLE: Objection as to form.
21    MR. VESSELS: Okay.
22 Q. Well, okay. She'll note objections
23 sometimes, but go ahead and answer.
24 A. No.
25 Q. Okay. And why would it not be fair to say

26

1  that?
2  A. My definition of a chief operating officer
3  is being more of -- I guess being more
4  knowledgeable about the finances.
5  Q. Okay. I would call that a chief financial
6  officer.
7     But you were in charge of all things
8  nursing; right?
9  A. Yes.
10 Q. You were in charge of making sure the
11 aides went out to the homes and took care of
12 people?
13 A. Well, I had supervisors to do that and the
14 supervisors would.
15 Q. So you were in charge of the supervisors?
16 A. Yes.
17 Q. So you were the supervisor of the
18 supervisors?
19 A. Yes.
20 Q. In fact, you were the ultimate supervisor
21 when it came to the nursing operations?
22 A. Uh-huh.
23 Q. That's a yes?
24 A. Yes.
25 Q. By -- after you got your 15 percent of the

27

1  company, were there any shareholders other than you
2  and Lance Blankenship and your husband?
3  A. No. Well, his wife.
4  Q. Lance Blankenship's wife owned shares?
5  A. Yes.
6  Q. So Lance Blankenship and Lance
7  Blankenship's wife, you and your husband were the
8  shareholders of the company?
9  A. Yes.
10 Q. And, you know, I think I have asked this
11 and you've answered it, but you became vice-
12 president in 2003?
13 A. Well, approximately.
14 Q. Okay. And why did you become vice-
15 president again?
16 A. Just -- that's just the title he said that
17 I could have and we had hired Paula Frollini.
18 Q. And who is Paula Frollini?
19 A. The Director of Health Care Services.
20 Q. So you essentially were promoted above
21 her?
22 A. Yes.
23 Q. And so he had to give you a title?
24 A. Yes.
25 Q. And he gave you the title of vice-

28

1  president?
2  A. Yes.
3  Q. Did you know at the time that made you an
4  officer of the corporation?
5  A. I can't say exactly I knew that.
6  Q. How does the home health care business
7  work with regard to payment?
8     I understand that nurses go out and help
9  people in their homes, nursing aides.
10 A. Yes.
11 Q. Who pays for this typically?
12 A. State programs, federal problems.
13 Q. Medicare?
14 A. Medicare, Medicaid, commercial insurance
15 and private pay.
16 Q. So some people pay for themselves?
17 A. Yes.
18 Q. Sometimes it's private insurance like Blue
19 Cross?
20 A. Yes.
21 Q. Medicare?
22 A. Yes.
23 Q. Medicaid?
24 A. Yes.
25 Q. What percentage?

DEPOSITION OF DIANE LYNN HUNTER

29

1  Where does the bulk of the business come
2  from?
3  A. Medicaid.
    Q. Medicaid?
5  A. Yes.
6  Q. What about Medicare?
7  A. That is not the bulk of the business.
8  Q. When you say bulk for Medicaid, more than
9  half?
10  A. Medicaid is always about 70 percent.
11  Q. In general in the home health care
12  business, who do you employ to do this type of
13  work?
14  A. Nurses aides, physical therapists.
15  Q. Do you use registered nurses to do the
16  work?
17  A. Yes.
18  Q. And depends on the type of care that's
19  needed in the house?
20  A. Yes.
21  Q. In the nursing field the lowest level of
22  certification, if there is even a certification,
23  would be an in-home aide?
24  A. Personal care aide.
25  Q. Do they have to have any certification for

30

1  that?
2  A. A personal care aide does not.
3  Q. And they would be paid the least?
4  A. No.
5  Q. Who would be?
6  A. Occasionally we have chore workers.
7  Q. Okay. I understand.
8      And so it could be anything from an
9  in-home aide to a licensed practical nurse?
10      Do you use those?
11  A. Yes.
12  Q. And then up the scale to registered
13  nurses?
14  A. Yes.
15  Q. Physical therapists?
16  A. Yes.
17  Q. Just depends on how sick they are and the
18  types of injuries or illness?
19  A. Yes.
20  Q. How many employees did the company have in
21  the summer of 2004?
22  A. Probably 230. Approximately 230.
23  Q. How many offices were there?
24  A. In 2004, the same amount of offices, I
25  believe.

31

1  Q. Bridgeport?
2  A. Bridgeport, Wheeling.
3  Q. Marietta?
4  A. Marrietta. Oh, wait. I think we had
5  Athens.
6  Q. And Athens. Okay. I want to talk about
7  the health plan for UOV. And in your affidavit
8  that we already talked about it says -- you said,
9  "In or about 2002 the plan was converted from an
10  insured plan to a self-funded plan. Participants
11  contributed to the funding of the plan benefits
12  through payroll deductions which were to be
13  credited to the plan's account at Fifth-Third Bank
14  in Lexington, Kentucky and later at WesBanco Bank
15  in Wheeling, West Virginia."
16      Is that correct?
17  A. Yes.
18  Q. And that's what you wrote in your
19  affidavit?
20  A. Yes.
21  Q. Before 2002 you referred to a plan.
22      Were the employees covered under a health
23  plan for the company?
24  A. In 2002?
25  Q. Yes.

32

1  A. I think there was Health Assurance or
2  Carelink. I'm not sure of the plan.
3  Q. It was an insured plan?
4      Do you know what that means?
5  A. Yeah, a regular plan.
6  Q. Using a health insurance company.
7  A. Yes.
8  Q. You would pay premiums to them and they
9  would take care of it?
10  A. Yes.
11  Q. Not sure who it was in '02?
12  A. I'm not positive.
13  Q. But sometime in '02 the company UOV
14  switched to a self-funded plan?
15  A. Yes.
16  Q. Whose idea was that?
17  A. Lance and I believe he had Alex Wilson at
18  that time.
19  Q. Who is Alex Wilson?
20  A. He was a broker. And Wendy Conley was the
21  vice-president of HR in his Kentucky office, but
22  she was in charge of finding the insurance to cover
23  all of his offices.
24  Q. The Kentucky office.
25      Lance had an office in Kentucky?

33

1    A. Yes.
2    Q. What did he do out of Kentucky?
3       Was he there most of the time?
4    A. Yes.
5    Q. Did he have another franchise in Kentucky?
6    A. Yes.
7    Q. Separate from the one up here?
8    A. Yes.
9    Q. You had nothing to do with that one?
10   A. No.
11   Q. Did Lance talk to you before the company
12   switched from an insured health plan to a self-
13   funded plan?
14   A. No.
15   Q. Who in the company was in charge of
16   administering the self-funded health plan?
17   A. You mean setting it up?
18   Q. No, once it got set up. Now, tell me if
19   I'm wrong and see if this is your understanding of
20   it, that a self-funded plan means just what you
21   said in your affidavit, you would take premiums
22   from the employees?
23   A. Uh-huh.
24   Q. That's a yes?
25   A. Yes.

34

1    Q. Put it into an account?
2    A. Yes.
3    Q. And from that account the company would
4    pay for employee health claims instead of a health
5    insurance company; right?
6    A. Yes.
7    Q. And if it was more than what was in the
8    account the company would have to foot the bill for
9    the rest?
10   A. More than what was in the account?
11   Q. Well, if the employee contributions were
12   not enough to cover the employee medical claims the
13   company still had to foot the bill for the
14   remainder of the claims?
15   A. Yes.
16   Q. Okay. And once that got set up, who in
17   the company would be the point person on that, was
18   Lance in charge?
19   A. Wendy Conley was in charge. She was the
20   vice-president of human resources in Lexington,
21   Kentucky. And she -- everything went to her and
22   then she divvied everything out.
23   Q. Was she part of UOV?
24   A. No.
25   Q. She was part of a different company?

35

1    A. Yes, but she oversaw all of his offices.
2    Q. So the employee health plan for Interim
3    UOV was also being administered through and with
4    another Interim franchise out of Kentucky?
5    A. Yes.
6    Q. Okay. What was the official name of the
7    company in Kentucky?
8    A. I don't remember.
9    Q. Wendy Conley, was she an officer of the
10   company?
11   A. She was the vice-president.
12   Q. She was a vice-president of that company?
13   A. Human resources. So she was overseeing
14   everything.
15   Q. Where does she live?
16   A. In I think Somerset, Kentucky. He also
17   had a Daytona, Florida office involved with that,
18   too.
19   Q. What did he have in Daytona?
20   A. A home health.
21   Q. So he had another franchise?
22   A. Yes
23   Q. How many franchises did Lance have?
24   A. I think three.
25   Q. So he had one in Ohio here?

36

1    A. Yes.
2    Q. One in Kentucky?
3    A. Yes.
4    Q. And another one in Florida?
5    A. Yes.
6    Q. All run independently of one another?
7    A. Yes.
8    Q. Other than the health plan?
9    A. Yes.
10   Q. Which was commingled?
11   A. Yes. And Wheeling, West Virginia, he had
12   an office there.
13   Q. He had an office here in Wheeling?
14   A. Yes.
15   Q. Were the premium paycheck or premium
16   payments placed in a bank account in Wheeling?
17   A. No. Initially they were in Kentucky.
18   Q. And you said in your affidavit they
19   switched to Wheeling?
20   A. Yes.
21   Q. To WesBanco?
22   A. Yes.
23   Q. And it was an account just for the
24   employee premiums?
25   A. Yes.

DEPOSITION OF DIANE LYNN HUNTER

37

1  Q. Who was in charge of the account?

2  A. He was. He only wanted his name on the

3 account.

4  Q. At any time did you ever have signature

5 authority on that account?

6  A. No.

7  Q. Was any other money put into or taken out

8 of this account other than health care premiums?

9  A. I don't know.

10  Q. Did you have any responsibility regarding

11 the employee health plan at UOV at any time?

12  A. What do you mean as far as responsibility?

13     I wasn't in charge of the plan.

14  Q. Did you ever have any dealings regarding

15 the health plan?

16  A. Such as?

17  Q. Did Lance bring you into any decision

18 making at all regarding the health plan?

19  A. What he told me, because everybody was in

20 such an uproar about their payments not being made,

21 that he -- HR at that time was Jeannie Gilson

22 up here and she would go to him and let him know

23 the outstanding claim and what was due.

24  Q. Okay. Well, you kind of segway'd, and I

25 was gonna save that until later, but it's a good

38

1 came to talk about that.

2     At some point after they switched from the

3 insured plan to the self-fund plan, did you notice

4 problems with the employee health plan at UOV?

5  A. After they switched to the self-funded

6 plan?

7  Q. Yes.

8  A. Not initially. It was really into 2004.

9  Q. Okay. What did you learn in 2004?

10  A. That he wasn't paying their claims.

11  Q. Who is their?

12  A. The employee's claims.

13  Q. Who told you this?

14  A. Jeannie told me.

15  Q. Jeannie Gilson is who?

16  A. Jeannie Gilson is the human resource.

17 Barbara Marshall told me this.

18  Q. So Barbara Marshall came to you, Jeannie

19 Gilson came to you and said employees are not

20 having their health claims paid?

21  A. Well, yes. Lance knew this.

22  Q. And did you -- did you come to learn that

23     was not taking funds from the premium account to

24 pay the claims?

25  A. Say that again.

39

1  Q. Did you learn the reason why the claims

2 were not being paid?

3  A. Yes.

4  Q. What did you find out?

5  A. Because he wasn't putting money into the

6 account to pay them.

7  Q. So the premiums were being taken out of

8 the employee paychecks?

9  A. Yes.

10  Q. And they were not being put into the

11 premium account at WesBanco?

12  A. Yes.

13  Q. And you learned this?

14  A. Yes.

15  Q. When did you learn this?

16  A. In 2004.

17  Q. How did you know that he was not putting

18 the premiums in the account?

19  A. Because employees were complaining and

20 Barbara Marshall was getting a lot of phone calls

21 from doctor's offices and hospitals and so was

22 Jeannie Gilson.

23  Q. Did you -- but that still doesn't answer,

24 how do you know that he wasn't putting the premium

25 money into the account?

40

1  A. Just because of the phone calls.

2  Q. Well, you're making the assumption. Let

3 me ask this.

4     What if the employee medical claims were

5 more than what was in the account?

6     Could that have been a possibility?

7  A. Say that again.

8  Q. Could Lance have been putting the money

9 into the account like he was supposed to and still

10 not have enough to pay the claims?

11  A. Could that have happened?

12  Q. Yes.

13  A. Yes.

14  Q. Okay. So you don't know if that happened

15 or if he was simply pocketing the premium money?

16  A. Correct.

17  Q. In your affidavit you stated, "Over a

18 period of years Lance Blankenship wrote numerous

19 checks to himself and his family on UOV's operating

20 accounts. Such payments would have been more than

21 sufficient to fund the benefits payable under the

22 plan." Correct?

23  A. Yes.

24  Q. How did you know this?

25  A. Because I looked at the canceled checks

41

1 that came in.

2    Q. So he was simply writing himself checks?

3    A. Yes.

4    Q. So if the expenses were greater than the
5 income coming in, he would still write himself
6 checks?

7    A. Yes.

8    Q. And you were aware this was going on?

9    A. Yes.

10    Q. When were you aware this was going on?

11    A. Probably in late 2003 then definitely
12 in 2004 when I looked at the canceled checks.

13    Q. So you learned in 2004 that employee
14 medical claims were not being paid, yes?

15    A. Yes.

16    Q. And you also learned that he was still
17 taking money out of the account for himself?

18    A. Yes.

19    Q. Do you know what kind of amounts we are
20 dealing with that he would draw out for himself?

21    A. Sometimes 5,000. Sometimes $15,000.

22    Q. How often would this happen?

23    A. At least monthly.

24    Q. So he would take 5, 10, 15,000 out a
25 month?

42

1    A. Yes.

2    Q. Even if the bills were such that he
3 couldn't take any out legitimately?

4    A. Yes.

5    Q. But as a shareholder of the company you
6 were not receiving any of those similar type
7 payments?

8    A. No.

9    Q. But you were receiving a salary?

10    A. Yes.

11    Q. By this time we are talking the $80,000
12 salary?

13    A. Yes.

14    Q. Did you get raises every year?

15       So in '04 you would be earning 80; is that
16 right?

17    A. I didn't get raises every year.

18    Q. Well, '03 what were you earning?

19    A. Maybe 70,000, 75,000. That's a guess.

20    Q. '02 would have been 70 or a little below?

21    A. Probably the same thing.

22    Q. Okay. You said you learned in 2004 that
23 the employee's medical claims were not being paid
24 and you learned this from several people; right?

25    A. Yes.

43

1    Q. Did you get -- were you told how many
2 employees were affected by this?

3    A. How many?

4    Q. Yes.

5    A. The people that were participating on the
6 plan.

7    Q. Well, I mean, you had 230 employees;
8 right?

9    A. Uh-huh.

10    Q. That's a yes?

11    A. Yes.

12    Q. And presumably not all of them
13 participated in the health plan; right?

14    A. Correct.

15    Q. But of the ones that were participating
16 was this an isolated incident that claims weren't
17 being paid?

18    A. Isolated? Isolated for who, certain
19 people?

20    Q. Yes.

21    A. No. It was none of them were being paid
22 is what I understood.

23    Q. Okay. That's -- so all of the
24 participating employees were having problems having
25 their medical bills paid?

44

1    A. Yes.

2    Q. And you learned that at that time?

3    A. Yes.

4    Q. At that time when you learned that all of
5 the participating employees were not having their
6 medical bills paid, were you given an idea of how
7 much the aggregate amount of the unpaid claims
8 were?

9    A. Jeannie Gilson probably had given me the
10 form showing the number.

11    Q. What was the ball park at that point?

12    A. I don't know at that point. I know at the
13 end of the year it was around 340,000, the end of
14 2004.

15    Q. So by the end of 2004, December time
16 frame, you knew that there were $340,000 roughly of
17 unpaid employee medical claims?

18    A. Yes.

19    Q. Did you talk to Lance Blankenship about
20 this?

21    A. Oh, yes.

22    Q. And what did he say?

23    A. That's where the sale of Marietta and
24 Athens came into play.

25    Q. Okay. We're gonna get to that. I don't

DEPOSITION OF DIANE LYNN HUNTER

45

1  want to jump the gun.  I understand.  We're gonna
2  get to that.
3        I take it you learned that the employees
   ren't having their medical bills paid, you're
5  high up in the company; right?
6     A. Uh-huh.
7     Q. That's a yes?
8     A. Yes.
9     Q. So you went to Lance and you said what?
10    A. When I learned of it, initially learned of
11 it, I asked him what the heck was going on.
12    Q. All right.  What did he say?
13    A. And he said, "Well, I'm working on it.  I
14 have a company called GSI where I'm gonna get
15 funding from them."  And he struggled all that year
16 to try to get funding from this company, but I
17 think that they were some fly by night company and
18 they never pulled through.
19    Q. When you say funding, you mean a loan?
20    A. Yes.
21    Q. When was it that you had this
22 conversation?
23    A. During 2004.
24    Q. Summertime?
25    A. Before that.

46

1     Q. Springtime?
2     A. Probably early in the year.
3     Q. Do you know or did you ever learn that
4  anyone had made unauthorized withdraws from the
5  premium account?
6     A. I don't know, no.
7     Q. Okay.  Why was the company not able to pay
8  the claims?
9     A. Because he was taking so many.
10    Q. You think?
11    A. I think.
12    Q. Or it simply wasn't funded enough?
13    A. Yes.  But I had the copies of canceled
14 checks that he was taking money for himself.
15    Q. From the operating account?
16    A. Yes.
17    Q. Did the situation get any better after you
18 learned of this?
19    A. No.
20    Q. So throughout 2004 we still have the
21 problem with unpaid medical claims for the
22 employees?
23    A. Yes.
24    Q. Did any of the employees, other than
25 Jeannie and Barbara Marshall, did any of the

47

1  employees ever call and talk to you personally
2  about the medical claims?
3     A. Yes.
4     Q. Who?
5     A. Sandy.
6     Q. Sandy Schilling?
7     A. Yes.
8     Q. What did she tell you?
9     A. Just that she was really upset with Lance
10 and she hated him because her -- she was gonna end
11 up in collection.
12    Q. Because her medical bills not being
13 paid?
14    A. Yes.
15    Q. Did she tell you the approximate amount of
16 her medical bills that weren't being paid?
17    A. She told me $10,000.
18    Q. And when did she tell you this?
19    A. Sometime during that year, 2004.
20    Q. Did Janet Boyce ever call you?
21    A. She did not call me.
22    Q. Did she ever come to you personally?
23    A. I had seen her twice at the office.
24    Q. In '04?
25    A. I don't know the exact year.

48

1     Q. Was it during --
2     A. During the -- yeah.
3     Q. It was during this period where the
4  problems were?
5     A. Yes.
6     Q. Before the end of 2004 then?
7     A. Yes.
8     Q. So Janet Boyce came to you and said what?
9     A. She had a lot of bills that weren't being
10 paid.
11    Q. Did she give you the approximate amount?
12    A. No, she did not.
13    Q. She said a lot though?
14    A. She said a lot.
15    Q. Did she tell you that she had surgery?
16    A. I don't remember her saying that.
17    Q. Did she tell you that she had bills from
18 the Cleveland Clinic that hadn't been paid?
19    A. She did not tell me that.  She did not
20 tell me that until 2005.
21    Q. What part of 2005?
22    A. The beginning, the first quarter.
23    Q. January of '05?
24    A. The first quarter.
25    Q. So sometime in January, February or March

DEPOSITION OF DIANE LYNN HUNTER

49

1 of 2005 Janet Boyce told you the approximate size
2 of the unpaid claims?
3     A. She did not tell me the size.
4     Q. What did she tell you?
5     A. She did not tell me the amount.  She just
6 said that she had a lot of bills from Cleveland
7 Clinic and she asked when they were gonna get
8 paid.  And I told her that the reason that he sold
9 this to me was that the accounts receivable from
10 Marietta and Athens was to go -- the deal was that
11 the money was to go toward the health insurance and
12 that that money was still coming in.
13     Q. Okay.  Did you ever try to make the
14 employees better about this?
15     A. Well, sure.  The money from the accounts
16 receivable for Marietta and Athens was to go toward
17 the health insurance claims.
18     Q. Okay.  We'll get to that in just a bit.
19        So fair to say that this medical claim
20 issue is a big deal to the employees of the
21 company?
22     A. Yes.
23     Q. You had meetings about this issue, didn't
24 you?
25     A. Yes.

50

1        (Deposition Exhibit No. 1 was marked for
2        identification.)
3     MR. VESSELS:
4     Q. All right.  I'm gonna hand you what I have
5 already marked as Exhibit 1.  This is a document
6 that you have given to me.
7     A. Uh-huh.
8     Q. Are these the minutes of the supervisory
9 meeting on September 13, 2004?
10     A. Yes.
11     Q. What was that meeting?
12     A. This was concerning the health insurance
13 not being paid.
14     Q. Again, it was September 13th, 2004?
15     A. Yes.
16     Q. And you were at that meeting; right?
17     A. Yes.
18     Q. Were you there for the entire meeting?
19     A. Yes.
20     Q. Who else attended the meeting other than
21 you?
22     A. Lance Blankenship, Paula Frollini, Kim
3 Gerst, Sharon Jebbia, Karen Craig, Jeannie Gilson,
24 Wanda Morris and Sandy Schilling.
25     Q. Sandy Schilling, the plaintiff in this

51

1 case?
2     A. Yes.
3     Q. And Paula Frollini was who?
4     A. The Director of Health Care Services.
5     Q. Sharon Jebbia was?
6     A. She was the home care supervisor.
7     Q. Karen Craig?
8     A. Marketing.
9     Q. Jeannie Gilson?
10     A. Human resources.
11     Q. Wanda Morris?
12     A. Home care supervisor.
13     Q. So the purpose of the meeting was to talk
14 about the uproar about the health claims; right?
15     A. Yes.
16     Q. Let's take us through the minutes.
17        What did Jeannie Gilson say, first page?
18     A. You want me to read to you?
19     Q. Well, I'll go ahead and read it.  Jeannie
20 Gilson said, and you can just agree if that's what
21 she said, she wrote, or somebody, whoever took the
22 minutes, wrote, "1, Concerns over future and
23 stability of the company; 2, Unpaid claims of
24 Sharon Clutter and Cheryl Miller; 3, Employee
25 complaints that Lance doesn't return phone calls

52

1 and is not present for employees to discuss issues
2 with him."
3        Is that what she said at the meeting?
4     A. Yes.
5     Q. And you remember her talking about that?
6     A. Yes.
7     Q. And then Lance responded.
8        What was his response?
9        You don't have to read the minutes.
10        Do you remember what he responded to that?
11     A. Well, I have to read them.  Sharon
12 Clutter's issues were being addressed.  He was
13 still addressing problems even though not present
14 in the office.  Still pursuing current funding
15 through GSI.  The funding should be here by 9-14.
16 Plan B was funding through Alamo.  And assurance
17 that all medical claims would be paid as soon as
18 the funding is here.
19     Q. So he is still talking at this meeting
20 about getting some type of loan to cover all this
21 mess; right?
22     A. Yes.
23     Q. Let's skip down to Wanda.  The notes say
24 an employee had contacted the Insurance
25 Commissioner.

DEPOSITION OF DIANE LYNN HUNTER

53

1    Do you remember her saying that?
2    A. Yes.
3    Q. So from what you learned from that meeting
     e Ohio Insurance Commission had been contacted?
5    A. Yes.
6    Q. And then employees had received forms to
7    file complaints regarding their health insurance?
8    Do you remember that?
9    A. I remember it from reading the minutes
10   here, yes.
11   Q. Right. You independently remember that.
12   Does it jog in your memory?
13   A. Yes.
14   Q. And do you know if the employees did file
15   complaints with the Ohio Department of Insurance?
16   A. I know that Tim Simpson did, but he wasn't
17   on the insurance. But he did file a complaint
18   anyway.
19   Q. If he wasn't on the insurance why was he
20   filing a complaint?
21   A. I can't answer that.
22   Q. Let's go to page 2. Sandy Schilling from
23   the plaintiff in this case, she expressed concern
24   over her personal claims; right?
25   A. Yes.

54

1    Q. And she also said at that meeting that she
2    is making out-of-pocket payments; right?
3    A. Yes.
4    Q. And she was asking about the employee
5    contributions; right?
6    A. Yes.
7    Q. Do you remember if anyone responded to
8    that?
9    I don't think it would be in the minutes.
10   A. If he expanded to it?
11   Q. Yeah. Did Lance say anything about that?
12   A. I don't remember.
13   Q. So as of this meeting for certain you knew
14   that Sandra Schilling's medical claims had not been
15   paid?
16   A. Yes.
17   Q. And also had known that from a prior phone
18   call from her; right?
19   A. Yes.
20   Q. Let's move down to Jeannie, same page.
21   She questioned why employee contributions for
22   insurance were not being put into a separate
23   count.
24   Do you remember her asking that?
25   A. Yes.

55

1    Q. Did Lance make any response to that?
2    A. I don't remember.
3    Q. You don't remember?
4    Did he not try to defend himself or --
5    A. I don't remember.
6    Q. Jeannie also said she raised some type of
7    question how we were to pay claims when the medical
8    account in Kentucky has a court-ordered
9    garnishment.
10   Do you remember that?
11   A. Yes.
12   Q. What was she talking about?
13   A. Somebody had garnished the account down
14   there and I remember her telling me that, that
15   somebody garnished the account and so if they put
16   money in it that garnishment would be taken out of
17   the account.
18   Q. So somewhere along the line someone got a
19   judgment against Lance Blankenship or the company;
20   right?
21   A. I --
22   Q. You're not sure?
23   A. I don't know.
24   Q. But nonetheless you know that there's some
25   type of court-ordered garnishment on the employee

56

1    premium account?
2    A. That's what Jeannie had told me.
3    Q. So that's why they couldn't use that
4    account any more; right?
5    A. I would -- I don't know.
6    Q. Was that the reason he switched up to
7    using the WesBanco account in Wheeling?
8    A. I don't remember the reason why he did
9    that.
10   Q. Well, let's move down. Lance assured the
11   employees that out-of-pocket payments for claims
12   would be fully reimbursed when the funding comes
13   through; right?
14   Do you remember him saying that?
15   A. Yes.
16   Q. He is referring to the loan he was trying
17   to get?
18   A. Yes.
19   Q. How much of a loan was he trying to get?
20   A. I don't know the amount.
21   Q. Do you know if he was ever successful in
22   getting a loan?
23   A. He was not successful.
24   Q. At the date of this meeting do you know
25   how much the unpaid claims were at this meeting,

DEPOSITION OF DIANE LYNN HUNTER

57

1 September 13th, '04?
2     A. I don't know the -- I don't know the exact
3 amount at that time.
4     Q. Did you know it was at least several
5 hundred thousand dollars?
6     A. Yes.
7     Q. Now, you also spoke at the meeting; right?
8     A. Yes.
9     Q. We are on the third page, I believe.
10     A. Uh-huh.
11     Q. You expressed doubts about getting the
12 funding; right?
13     A. Yes.
14     Q. Why did you have doubts?
15     A. Because it had been going on so long and
16 the company wasn't calling him back and he just
17 wasn't getting anywhere with it.
18     Q. So at that meeting would it have been your
19 opinion, based on what you said, that you believed
20 that the company UOV was not in a financial
21 position to obtain financing to cover the medical
22 claims of the employees?
23     A. Say that again.
24     Q. Based on what you said at this meeting
25 that you expressed doubts in funding; right?

58

1     A. Yes.
2     Q. Was it your opinion that UOV was not in a
3 financial position to obtain a loan?
4     A. No.
5     MS. McARDLE: I'm sorry, no, they weren't
6 in a financial position?
7     A. I can't say that they weren't in a
8 financial position to get a loan. I think he had
9 the wrong person to try to get a loan from.
10     Q. Okay. Well, the next item you mentioned
11 bankruptcy and you said it may have to occur;
12 correct?
13     A. Yes.
14     Q. You said that at the meeting?
15     A. Yes.
16     Q. So based on your comment about bankruptcy
17 would it have been your opinion at the time that
18 UOV did not have the financial position to cover
19 its outstanding obligations?
20     A. Yes.
21     Q. And this was because of the unpaid
22 employee medical claims; right?
`     A. And all his other bills.
24     Q. And what are the other bills?
25     A. His rent, his taxes, telephone, the Alltel

59

1 bill. Just bill collectors were constantly
2 calling.
3     Q. So in addition to what you knew at the
4 time was several hundred thousand dollars of unpaid
5 employee medical claims, there were telephone
6 bills, other bills from creditors?
7     A. Yes.
8     Q. There was more asked to go out of the
9 business than was coming in, right, money?
10     A. Yes.
11     Q. Let's go to the next page. Karen. Spoke
12 of damage control. This was Karen --
13     A. Craig.
14     Q. -- Craig. What was she speaking about
15 damage control?
16     A. Because doctors were asking her. She
17 would go in to market and they would ask why their
18 bills weren't paid.
19     Q. So they would go in to market your in-home
20 health care services?
21     A. Yes.
22     Q.  And the doctors were angry because your
23 own employees couldn't pay their medical bills;
24 right?
25     A. Yes.

60

1     Q. And that was embarrassing to the company?
2     A. Yes.
3     Q. And embarrassing to the employees?
4     A. Yes.
5     Q. Sharon, the next line down, said her
6 doctor would not accept her insurance; right?
7     A. Yes.
8     Q. So it got to the point where employees
9 would go to the doctors and the doctors wouldn't
10 treat them because they knew that they couldn't get
11 paid?
12     A. Yes.
13     Q. Specifically they knew about the UOV
14 employee health plan wouldn't pay them?
15     A. Yes.
16     Q. Sharon also mentioned a possibility of a
17 class action suit from the employees; correct?
18     A. Yes.
19     Q. And you remember that?
20     A. Yes.
21     Q. And this would be regarding the unpaid
22 health claims; right?
23     A. Yes.
24     Q. So I see at the bottom it says next
25 meeting September 20, '04; right?

DEPOSITION OF DIANE LYNN HUNTER

61

1    A. Yes.
2    Q. Was there another meeting?
3    A. I believe, yeah, there was.
4    Q. Okay.
5    A. There were a couple meetings.
6        (Deposition Exhibit No. 2 was marked for
7        Identification.)
8        MR. VESSELS:
9    Q. Before we get to the next meeting I have
10 another document, and this is Exhibit 2.
11       This is a document that you gave to me;
12 correct?
13   A. Yes.
14   Q. And it consists of a fax cover sheet and a
15 letter attached; right?
16   A. Yes.
17   Q. What is this that we're looking at, the
18 two pages?
19   A. Well, this is the cover page to Dan Riston
20 who is the president of DGA.
21   Q. Who is DGA?
22   A. Diversified Group Administrators.
23   Q. Is that the third-party administrator that
24 would handle the claims for the UOV health plan?
25   A. Yes.

62

1    Q. Was the fax cover sheet sent from you?
2    A. Yes.
3    Q. And that's your signature on it?
4    A. Yes.
5    Q. And in the message you wrote, "Lance told
6 me to send this to you;" correct?
7    A. Yes.
8    Q. What does the rest of that say? I can't
9 read your writing.
10   A. "I can get him to sign an original
11 tomorrow."
12   Q. Okay. Let's look at the next page.
13       What is this letter?
14   A. This letter is letting him know, Dan
15 Riston know, that Lance was planning on having
16 $200,000 sent to him toward unpaid claims.
17   Q. And I presume -- well, I won't presume,
18 let me ask.
19       Did you read this letter before you faxed
20 it?
21   A. Yes.
22   Q. So on September 2nd, 2004 you knew that
23 ﹏nce was trying to get $200,0000 from GSI
24 securitization?
25   A. Yes.

63

1    Q. And this was to pay unpaid employee
2 medical claims?
3    A. Yes.
4    Q. So far as you know, at least as of
5 September 2, '04, there were at least $200,000
6 dollars of unpaid medical claims?
7    A. Yes.
8    Q. Okay. Let's go on to the next meeting.
9        Did you have another meeting?
10   A. Supervisor's meeting, yes.
11       (Deposition Exhibit No. 3 was marked for
12       Identification.)
13       MR. VESSELS:
14   Q. Okay. I'm going to hand you Exhibit 3.
15       Are these the minutes from the September
16 22nd, '04 meeting?
17   A. Yes.
18   Q. And you gave these to me, right, during
19 discovery in this case?
20   A. I don't remember these.
21   Q. You do not remember these?
22   A. I remember those.
23   Q. You don't remember giving this document to
24 your lawyer to give to me?
25   A. I don't remember.

64

1        MS. McARDLE: It might have been from
2 Barbara Marshall's attorney attached to one of
3 their --
4        MR. VESSELS: Oh.
5    Q. Well, let me ask this. Did you attend
6 this meeting on September 22nd, 2004?
7    A. I don't remember, but let me see if my
8 name is in here. I don't remember attending this
9 meeting.
10   Q. Okay. Well, did you go to any other
11 meeting?
12   A. We had a couple meetings.
13   Q. Regarding the health insurance?
14   A. Yes.
15   Q. When were those meetings?
16   A. We were trying to set them up like every
17 week or every other week, somewhere around there.
18   Q. So we have the first one, September 13th.
19       Do you remember when the next one you went
20 to was?
21   A. I don't remember.
22   Q. A couple weeks later.
23       Is that a yes?
24   A. Yes.
25   Q. Do you remember what was said at those

65

1  meetings?
2      A. They were all based around the health
3  insurance.
4      Q. More of the same?
5      A. Yes, yes.
6      Q. More questions to Lance, "What is going
7  on?"
8      A. Yes.
9      Q. More runaround from Lance?
10     A. Yes.
11     Q. Any news that he had paid any of the
12 claims off?
13     A. He may have paid some off, but I don't
14 remember.
15     Q. Was he ever able to get the big lump sum
16 from anyone to pay off the claims?
17     A. No.
18     Q. And it continued this way throughout the
19 fall of '04?
20     A. Yes.
21     Q. At what point -- you mentioned earlier on
22 that you came to know in late '04 that there was
23 approximately $340,000 of unpaid employee medical
24 claims; right?
25     A. Yes.

66

1      Q. When did you learn this?
2      A. In December of '04. No. It may have been
3  November of '04.
4      Q. So approximately November of 2004 you knew
5  that there was around $340,000 of unpaid employee
6  medical claims under the UOV health plan?
7      A. Yes.
8      Q. Now, in your affidavit you stated that you
9  were the Director of Health Care Services until
10 August 28th, 2004, but you continued to be employed
11 by UOV until May 4, 2005; correct?
12     A. Yes.
13     Q. What happened on August 28th, 2004?
14     A. I resigned as vice-president from the
15 board.
16     Q. Why?
17     A. I had been looking at another Interim
18 Health Care office to buy on my own to break away
19 from Lance. It was just part of the process.
20     Q. Why did you stop serving as Director of
21 Health Care Services at UOV?
22     A. Because we had hired Paula Frollini.
       Q. Okay. All right. And then what -- after
24 August 28th, 2004 that's when you resigned from the
25 board of directors?

67

1      A. Yes.
2      Q. What was your capacity at UOV after that?
3      A. I was vice-president.
4      Q. Okay. So you were on the board of
5  directors, you resigned, but you still --
6      A. Oh, wait. I'm sorry, clinical operations.
7      Q. So you were no longer on the board of
8  directors after August 28, '04; correct?
9      A. Correct.
10     Q. But you were Director of Clinical
11 Operations?
12     A. Yes.
13     Q. And you mentioned that you wanted to start
14 looking to buy your own franchise; right?
15     A. Yes.
16     Q. And this was during the tumultuous period
17 involving the medical claims; right?
18     A. Yes.
19     Q. Why did you just not outright quit at that
20 point?
21     A. Because I was hoping I could either find
22 another or hope -- I wanted him to quit. I had
23 actually offered him $200,000. I went in his
24 office one day and said, "I'll give you $200,000 if
25 you leave now."

68

1      Q. You said this to Lance?
2      A. Yes.
3      Q. When was that?
4      A. During the summer of 2004.
5      Q. And that would have wiped out most of the
6  employee medical claims?
7      A. Yes.
8      Q. So you were offering him an out?
9      A. Yes.
10     Q. And he didn't take it?
11     A. He did not take it.
12     Q. Did you ever discuss with him dissolving
13 the company, UOV?
14     A. No, not those words.
15     Q. What words were used?
16     A. I just offered him money if he would leave
17 and completely stay out of the business. And I
18 also tried to encourage him to file bankruptcy.
19     Q. Where would you have come up with $200,000
20 to buy out Lance?
21     A. I don't know.
22     Q. You didn't have it?
23     A. No.
24     Q. So you were making an offer without
25 backing?

DEPOSITION OF DIANE LYNN HUNTER

69

1  A. I could have gotten it somehow, but I did
2  not have it at that time.
3  Q. You didn't have it in your bank account?
4  A. No.
5  Q. And why did he not want to jump at the
6  offer of $200,000?
7  A. He said it wasn't enough money.
8  Q. $200,000 wasn't enough money for a company
9  that couldn't pay its own bills?
10  A. Correct.
11  Q. How many times did you discuss this with
12  him?
13  A. Twice.
14  Q. Both times he turned you down?
15  A. Yes.
16  Q. Why did he turn you down?
17  A. Wasn't enough money.
18  Q. Okay. Both times?
19  A. Yes.
20  Q. Did you ever discuss with him that you
21  might create a new company?
22  A. Yes.
23  Q. When did you tell him this?
24  A. Shortly after that discussion.
25  Q. So he rejected you twice and you said, "I

70

1  might start a new company?"
2  A. Yes.
3  Q. What did he say to that?
4  A. "Good luck."
5  Q. Did you and he ever talk about the unpaid
6  medical claims during these series of discussions?
7  A. Yes.
8  Q. When he said good luck did he mean that in
9  a nice way or was he being sarcastic?
10  A. Sarcastic.
11  Q. And why was he being sarcastic?
12  A. Because he's a smart aleck.
13  Q. He didn't think you could do it?
14  A. Correct.
15  Q. Okay. Now, we are gonna start talking
16  about Interim Health Care of Southeast Ohio. And
17  from here on out I want to talk about SEO.
18  And I see from the Ohio Secretary of State
19  records that Interim Health Care of Southeast Ohio,
20  Inc., SEO, was incorporated on December 8th, 2004;
21  is that correct?
22  A. Yes, sir.
23  Q. You were listed as the initial director;
24  correct?
25  A. Yes.

71

1  Q. Why did you form SEO?
2  A. Because he finally agreed to sell Marietta
3  and Athens to me.
4  Q. Okay. So he kind of had a change of
5  heart?
6  A. Yes.
7  Q. What changed his heart?
8  A. Because I was interested in buying the
9  Allentown, Pennsylvania franchise.
10  Q. Of Interim Health Care?
11  A. Yes.
12  Q. How bad do you wish you had done that now?
13  A. No comment.
14  Q. So sometime in June or the summer $200,000
15  wasn't enough for him to be bought out?
16  A. Right.
17  Q. But by December he was ready to be bought
18  out?
19  A. Yes.
20  Q. But you say he is ready to be bought out,
21  but you did not just take over his shares of
22  Interim Health Care of the Upper Ohio Valley;
23  right?
24  A. I did not take over his shares.
25  Q. Instead you created SEO?

72

1  A. Yes.
2  Q. Why?
3  A. Because I wanted no part of him.
4  Q. No part of him or no part of his
5  business?
6  A. No part of him.
7  Q. At least in the summer you were offering
8  him money to step aside at UOV; right?
9  A. Yes.
10  Q. And you would have taken over?
11  A. Yes.
12  Q. But by December you thought that was not a
13  good idea; right?
14  A. No. He knew that I was seriously looking
15  at this other franchise and I think got afraid that
16  I would leave and move to Allentown.
17  Q. Right. So you started SEO?
18  A. Yes.
19  Q. To do what?
20  A. To buy Marietta and Athens.
21  Q. So the purpose of forming SEO was to buy
22  the Marietta and Athens portions of the franchise
23  from UOV?
24  A. Yes.
25  Q. But by that time, and you've already told

DEPOSITION OF DIANE LYNN HUNTER

73

1  me this, you knew that UOV owed substantial
2  obligations including unpaid employee medical
3  claims; right?
4      A. Yes.
5      Q. And it would have been your intent to
6  start a new company and not -- and you didn't want
7  to be liable for UOV's obligations; right?
8      A. Yes.
9      Q. In fact, would it be fair to say that you
10  specifically set out to make sure that your new
11  company would not be liable for the obligations of
12  UOV?
13      A. Say that again.
14      Q. Would it have been your intent in December
15  of '04 in forming SEO to make certain that your new
16  company would not be liable for the obligations of
17  UOV?
18      A. Yes.
19      Q. That was -- you intended that?
20      A. That wasn't my main intent.
21      Q. What was the other intent?
22      A. To save part of the company and keep
23  employees working.
24      Q. If you had stayed on with UOV you knew
25  that there would be ongoing problems with that

74

1  health plan; right?
2      A. It wasn't just that. Our relationship was
3  getting bad.
4      Q. You and Lance weren't getting along?
5      A. No.
6      Q. And I take it from our discussions you
7  don't consider Lance an honest, trustworthy
8  person?
9      A. That's correct.
10          (Deposition Exhibit No. 4 was marked for
11          Identification.)
12      MR. VESSELS:
13      Q. I'm handing you Exhibit 4.
14          Is this the Asset Purchase Agreement
15  between UOV and SEO?
16      A. Yes.
17      Q. You signed for SEO?
18          That's a yes?
19      A. Yes.
20      Q. Lance signed for UOV?
21      A. Yes.
22      Q. And tell me what the purpose of this
23  agreement was to do.
24      A. It was an Asset Purchase Agreement as it
25  says. It was to purchase the assets for the

75

1  Marietta and Athens office.
2      Q. And assets included not just physical
3  assets; right?
4      A. They were the car, they were -- they were
5  the assets of the business.
6      Q. You also bought intangibles; correct?
7      A. Such as what?
8      Q. Well, let's go down to paragraph 1. It
9  says "Sale and Purchase of Assets." It lists all
10  things. So if you go to the second page at the
11  top, item D, it says, "All customers lists,
12  records, franchise agreement covering the counties
13  of Washington, Athens and Meigs, and related
14  intangibles;" correct?
15      A. That's what it says, yes.
16      Q. And that included the goodwill of the
17  company?
18      A. Yeah. That's what it says, yes.
19      Q. So the purpose was not just to buy
20  physical things; correct?
21      A. Correct.
22      Q. It was also to buy the goodwill of the
23  company?
24      A. That's what it says.
25      Q. Because UOV had been operating in those

76

1  counties; right?
2      A. Yes.
3      Q. And you didn't want to start over from
4  scratch as a brand new unknown company?
5      A. Yes.
6      Q. And that's why you bought not just the
7  goodwill but customer lists, records; right?
8      A. Well, the customer list, I had spoken to
9  my attorney, who at that time was Ron Musser who
10  drew this up, and told them that we couldn't
11  actually buy customer lists. But he said it was
12  something that you just put in a contract anyway.
13  It was a standard to put in a contract.
14      Q. And you also were taking over UOV's
15  franchise territory; right?
16      A. Territory, right.
17      Q. So the franchise was an asset?
18      A. Yes.
19      Q. So the purpose was to buy everything owned
20  by UOV with regard to those counties and keep UOV's
21  existing client base; correct?
22      A. It was to keep the existing client base
23  and to keep the employees working.
24      Q. Right. How much was the listed price,
25  item number 4, page 2?

DEPOSITION OF DIANE LYNN HUNTER

77

1    A. $50,000.
2    Q. Why did the offer go from $200,000 in the
3 summer, which he turned down, to $50,000 in
4 December, which he accepted?
5    A. He accepted this and then he was going to
6 be put on as a consultant for six years and get
7 paid $2,000 a month.
8    Q. And correct me if I'm wrong, I thought you
9 said that you and Lance pretty much hated each
10 other by this point.
11    A. We didn't hate each other, but it would be
12 a way to get him -- I knew he wasn't gonna consult.
13 He couldn't consult. But it was a way to get him
14 out of the picture and let us run the business.
15    Q. How is it you are getting him out of the
16 picture if you're gonna keep him on as a
17 consultant?
18    A. Because he wasn't actually gonna function
19 in that capacity. It was just to get him his money
20 and get me away from him.
21    Q. So the intent was to give him $50,000 as a
22 purchase price and then more money later on, and
23 I'll put it in quotations, "as a consultant?"
24    A. Yes.
25    Q. Which is a way for him to get all the

78

1 money he wanted?
2    A. Is what we agreed on.
3    Q. In December of '04?
4    A. Uh-huh.
5    Q. Let's go to page 4 of the agreement, item
6 7D. It says, "To the best knowledge of seller,
7 that's UOV, it is not in violation of any
8 applicable law, statute, order, rule or regulation
9 promulgated or judgment entered by any federal,
10 state or locate court or governmental authority
11 relating to or affecting the operation, conduct or
12 ownership of such assets or business of seller. In
13 particular, seller represents and warrants that it
14 has no knowledge of any past, present or future
15 claims or allegations relating to any violation or
16 noncompliance with any environmental law, statute,
17 rule or regulation promulgated or entered by" --
18 and it says and I think it means any -- "any
19 federal, state or local court or governmental
20 authority regarding the operation of seller's
21 business or subject assets." Correct?
22    A. Yes.
23    Q. And I presume you read this agreement
24 before you signed it?
25    A. Yes.

79

1    Q. Now, you knew that wasn't true, that
2 paragraph; right?
3    A. Yes.
4    Q. So you knew that there were claims out
5 there against his business?
6    A. Health insurance?
7    Q. Yes.
8    A. Yes.
9    Q. And may I presume that you knew that it
10 not would not have been lawful for his company not
11 to pay employee health claims?
12    A. Correct. But the deal with all of this
13 transaction and the reason he sold Marietta and
14 Athens to me was to take the AR, the accounts
15 receivable, from Marietta and Athens, was 350,000.
16 The agreement was that as that money was coming in
17 he was to pay the health insurance claims. That's
18 the reason this transaction occurred.
19    Q. Where does it say that in there?
20    MS. McARDLE: Top of page 4.
21    MR. VESSELS: Okay. Which part of page 4
22 does it say that?
23    MS. McARDLE: Accounts receivable shall
24 remain the property and obligations of the seller.
25    MR. VESSELS: Okay.

80

1    Q. So that was the intent of the agreement?
2    A. Yes.
3    Q. The accounts receivable was to be UOV's?
4    A. Yes.
5    Q. And I did read that before I came in here;
6 however, it doesn't say anything in there "And
7 shall be used for the purpose of paying off
8 employee medical claims," does it?
9    A. Well, that was his money that he was to
10 pay off the health insurance claims with.
11    Q. Well, it wasn't his, Lance Bankenship's,
12 was it?
13    A. It was UOV's money.
14    Q. UOV's money. So at the date of this
15 contract you knew that there were $340,000 of
16 unpaid medical claims; correct?
17    A. Yes.
18    Q. And you were buying the assets of his
19 company?
20    A. Yes.
21    Q. And he was keeping the accounts
22 receivable?
23    A. Yes.
24    Q. Which is reflected in the agreement;
25 right?

81

1    A. Yes.
2    Q. But the purpose of the accounts receivable
3 retention was for him to pay off the unpaid
4 employee medical claims?
5    A. Yes.
6    Q. But it does not say that in the agreement
7 specifically, does it?
8    A. He doesn't say that specifically, but that
9 was why he sold the company to me or else I would
10 have purchased Allentown.
11    Q. Why did you not include something in the
12 agreement saying that, "If we do this, you keep
13 receivables and you must pay off these unpaid
14 employee medical obligations?"
15    A. Because we said that, we talked about
16 that.
17    Q. You talked about it verbally; right?
18    A. Yes.
19    Q. Why was it not written in the agreement?
20    MS. McARDLE:  Objection as to form.
21    Q. Go ahead and answer anyhow.
22    A. Because I felt at that time there was so
23 much turmoil and so much stress going on that we
24 could save part of the company, the employee's
25 claims would be paid, maybe then he would get out

82

1 of Bridgeport and sell Bridgeport to me.
2    Q. But that required you to trust Lance
3 Blankenship to actually use those receivable to pay
4 those employee medical claims; right?
5    A. And Barbara Marshall and the HR people.
6    Q. It required you to trust UOV's management
7 to actually use the receivables to pay off the
8 claims; right?
9    A. Yes.
10    Q. And you had no guarantee that that would
11 happen at the time, did you?
12    A. No.  I didn't have a guarantee on
13 anything.
14    Q. In fact, you could have structured the
15 agreement so that you would take the receivables of
16 UOV and you could have personally used that to pay
17 off the claims yourself; correct?
18    A. I couldn't do that.  I signed a Management
19 Services Agreement that those were his funds, UOV's
20 funds.
21    Q. Okay.  Well, we're gonna get to the
22 Management Services Agreement.  That's what
23 happened.
24        But you could have structured it so that
25 you took control of it and made sure it happened;

83

1 right?
2        You could have done that?
3    A. I mean, I could have done that, but
4 that -- I don't think anyone would have agreed to
5 that.
6    Q. Why?
7    A. I don't think he would have agreed to it
8 and I don't -- because it was Marietta and Athens'
9 accounts receivable, which was now my company.  I
10 think he thought that I wouldn't give him his money
11 maybe.  I don't know.
12    Q. But Lance Blankenship is sitting out there
13 at UOV knowing that there is $340,000 of unpaid
14 medical claims?
15    A. Yes.
16    Q. Would it not have been in his best
17 interest to come up with some agreement where you
18 take all of that over and he's out of the picture?
19    A. Well, that's why I offered him 200,000 and
20 he wouldn't leave.
21    Q. But still he wanted to do the agreement
22 the way you did it, right, so that he would keep
23 the accounts receivable?
24    A. This came from my attorney.  Any typical
25 sale like that, the owner of that portion would

84

1 keep the accounts receivable.  You would never give
2 it to a new owner.  You keep your accounts
3 receivable.
4    Q. You would if there were giant obligations
5 sitting out there, wouldn't you?
6    MS. McARDLE:  Objection as to form.
7    Q. Lance Blankenship at UOV had $340,000 of
8 unpaid medical claims and he knew that; right?
9    A. Yes.
10    Q. You were offering a way to buy a portion
11 of his business, UOV, his markets.
12        Part of what could be bargained for in
13 these sales includes accounts receivable; correct?
14    A. Correct.
15    Q. You could have either left the accounts
16 receivable with UOV, which you did; right?
17    A. Yes.
18    Q. Or you could have made part of the
19 agreement that, "I'll take the current accounts
20 receivable," if you both had agreed to it; right?
21    A. If we both had agreed to it.
22    Q. Is it you that did not want to get the
23 accounts receivable or was it Lance that didn't
24 want you to have the accounts receivable?
25    A. He didn't want me to have it.

DEPOSITION OF DIANE LYNN HUNTER

85

1    Q. Why not?

2         MS. McARDLE:  Objection as to form.  My

3    client cannot possibly testify as to Lance

     lankenship's state of mind.

5         MR. VESSELS:  Okay.  I understand.

6         MS. McARDLE:  And this entire deposition,

7    for the record, has been as to Lance Blankenship's

8    state of mind.  My client cannot testify as to

9    Lance Blankenship's state of mind.

10        MR. VESSELS:  Okay.  I'll acknowledge that

11   objection and I'll ask it this way.

12   Q. Did Lance ever say to you why he did not

13   want you to have the accounts receivable?

14   A. No.

15   Q. Let's go to the next page, item E, page

16   5.  It says, "There is no action or proceeding or,

17   to the best knowledge of the seller, investigation

18   pending or threatened against or involved seller or

19   seller's business."  Correct?

20   A. Yes.

21   Q. You also knew that that was not true;

22   right?

23   A. There is no investigation.

24   Q. Had the Department of Labor ever been

25   called involving UOV?

86

1    A. Yes.

2    Q. When had they been called?

3    A. Probably in 2004.

4    Q. And you knew that?

5    A. I knew that, yes.

6    Q. You knew that at this time when you signed

7    this agreement?

8    A. But I didn't remember that.

9    Q. It also said there is no action or

10   proceeding; correct?

11   A. Oh, correct.

12   Q. That "would materially and adversely

13   affect the financial condition, business or

14   operations of seller;" right?

15   A. Yes.

16   Q. And you knew that there had been a

17   garnishment on his Kentucky bank account; right?

18   A. Yes.

19   Q. Had there been any other lawsuits against

20   the company at this point that had been unresolved?

21        MS. McARDLE:  Objection as to form.

22   Kentucky is not a part of this company.

23   Q. Well, UOV's health premiums had been kept

24   ... Kentucky, hadn't they?

25   A. They were, but I don't think at this

87

1    time.  I don't think in 2004 they were.

2    Q. All right.  So by 2004 the health premiums

3    were being held in Wheeling?

4    A. Yes.

5    Q. Did -- had anyone sued Interim Health Care

6    of the Upper Ohio Valley at this point?

7    A. I don't remember.

8    Q. Okay.  At the time you signed this

9    agreement, and I'm not trying to retread the same

10   territory, but I want to make the record clear, at

11   the time you signed had you been given any

12   assurance that the outstanding employee medical

13   claims had been paid already, the $340,000 of

14   unpaid medical claims?

15   A. No.

16   Q. They were still unpaid at the time you

17   signed this?

18   A. Yes.

19   Q. Was there ever any intent for SEO to

20   assume any of the liabilities of UOV?

21   A. No.

22   Q. So you wanted to get UOV's assets;

23   correct?

24   A. Yes.

25   Q. And you wanted to not get their

88

1    liabilities; right?

2    A. Yes.

3    Q. You wanted to get the good things and not

4    the bad things involved with UOV?

5    A. Well, it was a new company for me.

6    Q. I understand that, but you wanted to get

7    whatever good things were associated with UOV,

8    correct, the assets?

9    A. Yes.

10   Q. But not the liabilities?

11   A. Yes.

12        (Deposition Exhibit No. 5 was marked for

13        Identification.)

14        MR. VESSELS:

15   Q. All right.  I'm handing you Exhibit 5.

16   What is Exhibit 5?

17   A. It's a Management Services Agreement.

18   Q. What is this?

19   A. This is just used so that I can use UOV's

20   provider number so that I can continue to bill

21   until I establish my provider numbers.

22   Q. So when you started SEO you couldn't just

23   go out and start operating; right?

24   A. Well, I could as long as I had this.

25   Q. I mean, absent anything else?

89

1   If you didn't have this you couldn't just
2 go out and start working in people's houses; right?
3   A. Correct.
4   Q. So you needed to have something where you
5 could keep working under the UOV auspices?
6   A. Just using the provider number, that's
7 all.
8   Q. So effective January 2nd, 2005 when this
9 was signed -- hold on.
10   A. January 1st.
11   Q. January 1st, 2005 SEO became the operator
12 of UOV's business operations; right?
13   A. Say that again.
14   Q. Well, this is a Management Services
15 Agreement.  And as I have read it --
16   A. Uh-huh.
17   Q. -- UOV would continue to be in existence;
18 correct?
19   A. Yes, sir.
20   Q. But so long as UOV was in existence after
21 this point SEO would conduct the business
22 operations of UOV in the Athens, Meigs and
23 Washington County markets; right?
24   A. SEO conducted business as SEO in Athens,
25 in Meigs and Washington County.

90

1   Q. But the agreement says that SEO is
2 operating UOV; right?
3   Am I reading it wrong?
4   A. The agreement by and between UOV and SEO.
5   Q. Okay.
6   A. And the agreement -- this agreement, the
7 whole thing with this agreement, which came from
8 the corporate office, is that I can continue to use
9 his provider numbers until I obtained my own for
10 SEO.
11   Q. Right.  But until you got those numbers
12 you had to operate as UOV; right?
13   A. No.  I operated as SEO, but I only used
14 his numbers so that I could continue to bill and
15 pay the employees.
16   Q. Is that legal to use somebody else's
17 number?
18   A. Yes, yes.
19   Q. But it says Owner, and I'm going
20 to page -- let's go to number 1, Duties and
21 Limitations.
22   Owner, that's UOV; right?
23   A. Yes.
24   Q. Hereby appoints manager as its exclusive
25 manager and grants manager all the power and

91

1 authority necessary to carry out in the manner best
2 deemed by manager and owner, the management of the
3 business; right?
4   A. Yes.
5   Q. And the business is UOV?
6   A. Wait a minute.  Well, I took the business
7 as SEO as far as I'm concerned with that.
8   Q. Okay.  You've said as far as you're
9 concerned?
10   A. Uh-huh.
11   MS. McARDLE:  Objection as to form.
12   MR. VESSELS:  Okay.
13   MS. McARDLE:  The entire paragraph
14 continues and says that each will act
15 independently.
16   MR. VESSELS:
17   Q. So did you operate under this Management
18 Services Agreement thereafter?
19   A. Until I got my Medicare certification in
20 April.
21   Q. When did you get that, oh, I'm sorry, in
22 April of '05?
23   A. Yes.
24   Q. Was this to exist until the time that you
25 closed the purchase of the assets agreement?

92

1   A. That was until I got my own provider
2 numbers.
3   Q. Okay.  And approval of the transfer of the
4 franchise; right?
5   Did you have to ask Interim national to
6 transfer UOV's franchise?
7   A. Yes.
8   Q. When did that go through?
9   A. I believe the -- when we got the Medicare
10 certificate in April.
11   Q. Happened all around the same time?
12   A. Yes.
13   (Deposition Exhibit No. 6 was marked for
14   Identification.)
15   MR. VESSELS:
16   Q. I'm handing you Exhibit 6.  Says Bill of
17 Sale.
18   What is this?
19   A. This is just the sale of -- let's see.
20 This is the sale from Marietta and Athens to me.
21   Q. Okay.  Is this the document that shows
22 that the Asset Purchase Agreement between UOV and
23 SEO had been concluded?
24   A. It's showing the transaction was
25 concluded.

93

1 Q. Okay. So this is what we call the
2 closing?
3 A. Yes.
4 Q. And it's dated April 6, 2005?
5 A. Yes.
6 Q. And this roughly coincides when you got
7 your new numbers for SEO?
8 A. Yes.
9 Q. And the franchise agreement was
10 transferred?
11 A. Yes.
12 Q. The Bill of Sale says in consideration of
13 $10.
14 Do you see that?
15 A. Uh-huh.
16 Q. The Asset Purchase Agreement said $50,000;
17 right?
18 A. Yes.
19 Q. Why did it go from $50,000 to $10?
20 A. I don't know why that is.
21 Q. Did you ever write a check to Lance
22 Blankenship for $50,000?
23 A. I wrote him a check for 25,000.
24 Q. When?
25 A. In December of '04.

94

1 Q. When you signed the Asset Purchase
2 Agreement?
3 A. Yes, yes.
4 Q. What about the other 25,000?
5 A. He didn't get that.
6 Q. Why not?
7 A. Because he -- wait a minute. He did get
8 that. He got that April 6th, I believe. I'm not
9 sure.
10 Q. So at the closing he got $25,000?
11 A. Yes.
12 Q. Why did it not say in consideration of
13 $25,000?
14 A. I don't know.
15 Q. Who wrote this Bill of Sale?
16 A. Ron Musser.
17 Q. Who?
18 A. Ron Musser.
19 Q. That was your attorney at the time?
20 A. Yes.
21 MS. McARDLE: Objection. Are you sure
22 about that?
23 THE DEPONENT: No.
24 MS. McARDLE: It's signed by Lance
25 Blankenship, and I know that Ron Musser did not

95

1 represent --
2 THE DEPONENT: Oh, this came --
3 MR. VESSELS:
4 Q. Who was Lance Blankenship's attorney?
5 A. Dave Labrodi. That's where it came from.
6 Q. Now, in this, and I don't want to say
7 interim because that will confuse everyone, in this
8 period between December 6, '04 and April 6, '05 did
9 the employees continue to complain about their
10 medical claims that had not been paid?
11 A. Janet Boyce came to me twice in that first
12 quarter of '05 and I had told her that was why that
13 Lance sold the business to me was to use the AR to
14 pay off her claims. So that was supposed to be
15 happening, but I wasn't in Bridgeport all the time.
16 Q. Who's medical plan was in effect during
17 that period of time?
18 A. There was no medical plan.
19 Q. So the employees had no medical coverage?
20 A. Not through me.
21 Q. Through anyone?
22 A. Not that I'm aware of.
23 Q. From December 4 -- or December 6, '04 or
24 was it December 4?
25 From the time you signed the Asset

96

1 Purchase Agreement, December 22nd until April 6,
2 '05, who were the employees employed by?
3 A. From December 22nd until --
4 Q. April 6 of '05.
5 A. No, until December 31st they were UOV.
6 Q. Okay.
7 A. And then I took over as SEO in January 1st
8 of '05, but I had no health insurance coverage for
9 the employees.
10 Q. So the employees would get their paycheck
11 from SEO?
12 A. Yes.
13 Q. But they didn't have any health coverage
14 at all?
15 A. No.
16 Q. So they were just going uncovered for a
17 period of time?
18 A. Yes, and they were aware of that.
19 Q. When did the UOV health plan officially
20 stop?
21 A. I don't know. I don't know when it
22 officially stopped.
23 Q. Did there ever come a point when the
24 announcement was made to the employees over e-mail
25 or however that says, "All right, the health plan

DEPOSITION OF DIANE LYNN HUNTER

97

1  is no longer effective"?
2      A. No.
3      Q. When did you start a new health plan, or
4  did you start a new health plan at SEO?
5      A. SEO started May 15 -- March 15h.
6      Q. '05?
7      A. '05.
8      Q. Who was that through?
9      A. Summit Health Insurance.
10     Q. Do you know what COBRA is?
11     A. Yes.
12     Q. Did any of the employees ask for or get
13 COBRA from the previous UOV plan?
14     A. No.
15     Q. Presumably because it was unfunded?
16     A. No one ever asked me about it.
17     Q. Okay. You mentioned earlier that the
18 Department of Labor conducted an investigation;
19 right?
20     A. They called. I don't know if they
21 conducted an investigation.
22     Q. Who called?
23     A. Lisa Wolf.
24     Q. When did she all?
25     A. She was calling Lance several times

98

1  throughout 2004 and he would not take her phone
2  calls. And this is what she told me. So I think
3  one of the employees, and I think it was Barbara
4  Marshall, came to me and said, "Would you please
5  talk to her, it's the Department of Labor, and he
6  won't return her calls"? So I answered the phone
7  and she identified who she was and said that she
8  had being trying to get in touch with him and left
9  him many, many messages and he would not return her
10 call. She really needed to speak to him about the
11 health insurance.
12     Q. Okay. On Exhibit 6, the Bill of Sale, you
13 already testified this is the closing of your Asset
14 Purchase Agreement; right?
15     A. Yeah. Yes.
16     Q. On April 6th, 2005 did Lance Blankenship
17 give you any assurance that the $340,000 of medical
18 claims had been paid?
19     A. I know that he was paying. Some of them
20 had been paid at that time.
21     Q. How much?
22     A. I don't know how much, but some of them
23 were paid.
24     Q. But did you get any assurance that they'd
25 all been paid?

99

1      A. Not that they had all been paid.
2      Q. On April 6, 2005 would it have been your
3  belief that most of the medical claims were still
4  unpaid?
5      A. No.
6      Q. That is no, they weren't paid or no, it
7  wasn't your belief?
8      A. No, it wasn't my belief.
9      Q. What was your belief?
10     A. I know that in January the HR, Jeannie
11 Gilson, told me that a lot of the claims were paid
12 because she was excited because the AR that was
13 coming into UOV was going toward it, toward the
14 health insurance claims.
15     Q. Jeannie told you this?
16     A. Yes.
17     Q. Did he follow through and finish it?
18         MS. McARDLE: Objection as to form.
19     Q. Did you ever come to learn that Lance
20 Blankenship had paid off all of the outstanding
21 employee medical claims?
22         MS. McARDLE: Objection as to form. There
23 is no time period.
24         MR. VESSELS: Okay. Well, no, I asked at
25 any point.

100

1      Q. Did you ever come to learn at any point in
2  time after you signed the December 22nd document,
3  did you ever learn that Lance Blankenship paid off
4  all of the outstanding employee medical claims?
5      A. I did not learn that he paid them all off.
6      Q. Did you ever ask him?
7      A. We were not speaking after -- I guess it
8  was about April we weren't really speaking to each
9  other.
10     Q. So in December the intent of the Asset
11 Purchase Agreement was that he would keep the
12 accounts receivable and pay off the unpaid employee
13 medical claims which were in the amount of
14 approximately $340,000; correct?
15     A. Yes.
16     Q. By April when you closed the sale, did you
17 not ask him, "Lance, have you paid off all of the
18 unpaid employee medical claims like you said you
19 would?"
20     A. No, because all of the accounts receivable
21 wouldn't have been in yet to go toward it.
22     Q. Okay.
23         MR. VESSELS: We have been going for quite
24 a while. Do you want to take a break?
25         MS. McARDLE: I would rather finish.

DEPOSITION OF DIANE LYNN HUNTER

101

1     (Off the record.)

2     MR. VESSELS:  Let's go back on the record,

3 please.

4     Q. You testified just recently that as of

5 January 1st, '05 the employees would no longer be

6 getting paychecks from UOV; correct?

7     A. Yes.

8     Q. And they got paychecks from you; right?

9     A. Okay.

10     Q. Okay.  I have not marked this as an

11 exhibit nor have I made copies.  This will be --

12     MS. McARDLE:  Actually I think it's on the

13 back of Exhibit 6 and stapled together.

14     MR. VESSELS:  Okay.  All right.  Yes,

15 that's the one I was looking for.  I'm sorry.  I

16 found another one.

17     MS. McARDLE:  They are on the back, 7 and

18 8.

19     MR. VESSELS:  Okay.  Let's go to 7 then.

20     (Deposition Exhibit No. 7 was marked for

21     Identification.)

22     MR. VESSELS:

23     Q. What is Exhibit 7?

24     A. That I would be no longer the authorized

25 signature on the operational account.

102

1     Q. Okay.  That's January 28th, 2005?

2     A. Yes.

3     Q. That's the UOV operating account?

4     A. Yes.

5     Q. And you had signature authority on that

6 account; right?

7     A. Yes.

8     Q. How long had you had signature authority

9 on that account?

10     A. Probably a year and a half.

11     Q. And as we testified earlier, as I

12 understand, when employee health claims were

13 submitted under the UOV health plan it was UOV's

14 obligation to make sure that they were paid; right?

15     A. Yes.

16     Q. And that would have been paid out of the

17 operating account, if necessary; right?

18     A. If the money was there and they all

19 decided.

20     Q. Who is they all?

21     A. Barb and Lance.

22     Q. Well, you keep saying Barb.

23     What is Barb's role in all of this?

24     A. She was accounts payable.  She was the

25 secretary of the corporation.  She had the

103

1 checkbook in her office.  She wrote the checks.

2 She had the checks.

3     Q. For the operational account?

4     A. And the -- she kept the medical account

5 also.

6     Q. So she took care of the checkbook for the

7 operating account and the employee premium account?

8     A. Yes.

9     Q. She would pay the claims?

10     A. Well, she kept the deposit slips for the

11 claims in there and she knew how much would go into

12 the medical account.

13     Q. So when the claims would come back in to

14 be paid they would go to DGA, right, third-party

15 administrator?

16     A. Yes.

17     Q. And they would come back to you and say,

18 "Here is how much the medical claims are;" right?

19     A. That's what they -- yeah.  They sent that

20 to Jeannie.

21     Q. And who would write the check for that?

22     A. Well, there had to be money in the medical

23 account and then Jeannie would release the claims.

24     Q. Jeannie Gilson?

25     A. Yes.

104

1     Q. Who would write the check though?

2     A. You mean for the claims?  There wasn't a

3 check written for the claims.

4     Q. Well, somebody had to pay DGA; right?

5     A. Oh, Barbara Marshall.

6     Q. So Barbara Marshall would write the check

7 and who would sign it?

8     A. She would use Lance's stamped signature.

9     Q. So Lance wouldn't even sign it himself?

10     A. No.

11     Q. She would just take a stamp and put it on

12 there?

13     A. Yes.

14     Q. So Barbara Marshall knew how much was in

15 the accounts?

16     A. Yes.

17     Q. And she knew what wasn't in the accounts?

18     A. Yes.

19     Q. And she knew that at all relevant times?

20     A. Yes.

21     Q. How long had she been in that position?

22     A. She was there before I was, in '93.

23     Q. She's been there the whole time?

24     A. Yes.

25     Q. And during the entire affair with the

DEPOSITION OF DIANE LYNN HUNTER

105

1 medical account she was in charge of accounting for
2 the medical accounts?
3     A. Except for when that Kentucky group was
4 involved.  When Wendy -- you know, when the account
5 was down there.
6     Q. Okay.  So at least after it was moved up
7 to Wheeling Barbara Marshall would be in charge of
8 that?
9     A. Yes.  She was responsible to write the
10 checks.
11     Q. On Exhibit 7 why did you want to be off
12 the account?
13     A. The operational account?
14     Q. Yes.
15     A. Because it was '05 and I had Marietta and
16 Athens and I really wasn't in Bridgeport that much.
17     Q. Okay.  Let's take a look at Exhibit 8.
18 Just pull those apart, please.
19         (Deposition Exhibit No. 8 was marked for
20         Identification.)
21     MR. VESSELS:
22     Q. What is Exhibit 8?
23     A. That's when I actually resigned from the
24 company completely.
25     Q. Okay.  Could you please read the entire

106

1 letter for the record, please?
2     A. Sure.  "May 4th of 2005.  Dear Lance, I am
3 resigning from my position with Interim Health Care
4 of the Upper Ohio Valley.  I've decided that it is
5 time for a change with my career.  I will inform
6 Kim of the process of claims releases with DGA.  I
7 am willing to help Nicole and Casey with the
8 required information for the cost report.  We have
9 certainly had some good and trying times.  Please
10 feel free for either yourself or for your staff to
11 call me with any questions or help whenever it is
12 needed.  Sincerely, Diane."
13     Q. Okay.  I don't understand this letter.
14     A. Okay.
15     Q. Why did you wait until May 4, 2005 to
16 resign?
17     A. Because he -- Lance wanted me to still
18 oversee Bridgeport occasionally, so as -- what's
19 the matter?
20     Q. No.
21     A. So I was up in Bridgeport maybe one to two
22 days a week, but Marietta and Athens three days a
23 week.
24     Q. So you were still operating at --
25     A. Clinical operations.

107

1     Q. You were stilling working for UOV
2 separately?
3     A. Yes, yes.
4     Q. And it says -- was there not an intent all
5 along when you got into the Asset Purchase
6 Agreement that after all that closed up that you
7 wouldn't have anything to do with UOV any longer?
8     A. No.  I was still to help them out whenever
9 they would have questions or needed any clinical
10 operation direction.
11     Q. Would you get paid for that?
12     A. Uh-huh.
13     Q. Were you still receiving a salary from
14 UOV?
15     A. Yes.  It was 40,000 a year.
16     Q. Lance was still in charge of the UOV
17 operations?
18     A. Yes.
19     Q. Why did you decide to resign at this point
20 then?
21     A. Because we had a major argument, him and
22 his -- he and his wife were on the phone with me in
23 Marietta and they were really upset because I
24 wasn't spending enough time in Bridgeport.  And I
25 told them that I couldn't do it because when I

108

1 bought the company in January I think Sandy worked
2 for me a week, her father ended up ill in the
3 hospital so she was gone six weeks.
4     So I paid her her full salary for the six
5 weeks while she was in the hospital taking care of
6 her father, even though she didn't have vacation
7 time or sick time, I had just paid her.  Then after
8 he died she came back to work for me for about two
9 weeks and then she resigned.  So I had no Director
10 of Health Care down there.  So I needed to focus on
11 Marietta and Athens.
12     Q. You testified earlier in your deposition
13 that at least from Christmastime of '04 through the
14 winter and toward April of '05, I mean, you had
15 already determined that Lance Blankenship was not
16 someone that you trusted; correct?
17     A. Correct.
18     Q. Your relationship had soured?
19     A. Correct.
20     Q. And yet you were willing to continue on as
21 some type of employee of his?
22     A. Well, it's not for him.  It was for the
23 other employees up in Bridgeport.  They felt
24 stranded and they needed my guidance.
25     Q. But you were the owner and president of a

109

1  new company; right?

2      A. Yes.

3      Q. Why did you feel some type of loyalty to

   that other company that had been doing wrong?

5      A. It wasn't to the company. It was to the

6  employees that I felt loyalty to. And they were

7  loyal to me. I had hired all of them. We have

8  known each other for years.

9      Q. But you were still an employee of Lance

10 Blankenship; right?

11     A. Yes, in the clinical standpoint.

12     Q. When you did this Asset Purchase Agreement

13 did not Lance believe that you would end up doing

14 that exclusively and not doing anything with him or

15 did he have the expectation that you would do that

16 and at UOV?

17     MS. McARDLE: Objection as to form. She

18 cannot testify as to what Lance Blankenship's

19 expectations were.

20     Q. Did he ever say what his expectations

21 were?

22     A. We had just talked about me, because we

23 were anticipating Sandy Schilling staying on and

24 working, so I had leadership down there. But when

25 she resigned, I ended up with no leadership really,

110

1  so I had to be there and then try to juggle helping

2  out in Bridgeport because they were afraid to be on

3  their own. And then I just couldn't do that. I

4  just couldn't keep it up.

5      Q. Why did you say, "I have decided that it

6  is a time for a change for my career?"

7      A. Meaning I wanted to terminate my career

8  with him.

9      Q. Then you go on --

10     A. And just to become a sole owner.

11     Q. I'm sorry, I didn't hear that.

12     A. And just become a sole owner of the

13 Marietta and Athens.

14     Q. You go on to say, "I will inform Kim of

15 the process of claims releases with DGA."

16     A. Yes.

17     Q. Who is Kim?

18     A. Kim is the new HR at that time.

19     Q. What is her last name?

20     A. Davis.

21     Q. Director of Human Resources?

22     A. Yes.

23     Q. At UOV?

24     A. Yes.

25     Q. What are the claims releases with DGA?

111

1      A. Just to show her how to release a claim as

2  the accounts receivable money continued to come in

3  and then she could get on line and just release the

4  weeks.

5      Q. You're talking about Diversified Group

6  Administrators; right?

7      A. Yes.

8      Q. This is still you're referring to the

9  ongoing cleanup operations of the UOV employee

10 health plan?

11     A. Yes.

12     Q. And so you were involved in that process?

13     A. No. I just knew how to show her how to

14 release the claim, so I was gonna show her how to

15 do that.

16     Q. Why were you the one that knew how to do

17 that?

18     A. Because Jeannie knew and Jeannie left and

19 she said, "Diane, this is how you do it," because I

20 never released a claim. So she showed me and then

21 I had to show Kim how to do it because I had hired

22 her.

23     Q. And that's some type of computer program?

24     A. You just get on line and you would say

25 like release week of 2-18-03, or whatever.

112

1      Q. So you're on line with DGA, the third-

2  party administrator; right?

3      A. You just e-mail them.

4      Q. You e-mail them or is it a web site?

5      A. You e-mail them.

6      Q. And you give them instructions to release

7  certain funds to pay off claims?

8      A. Certain weeks. You can just see the weeks

9  of what is due each week.

10     Q. But by this time there had been a backlog,

11 right, of unpaid claims?

12     A. I don't know what there was at that time,

13 because there was a lot of accounts receivable

14 money coming in that was to go toward those claims.

15     Q. Accounts receivable from SEO's operations?

16     A. From -- it was UOV's accounts receivable

17 that was -- he was supposed to put in the medical

18 funds.

19     Q. Okay. That's what I thought. So UOV's

20 accounts receivables were still coming in as of May

21 2005?

22     A. Yes.

23     Q. You knew that?

24     A. I knew that they were supposed to be. I

25 don't -- I didn't see them.

DEPOSITION OF DIANE LYNN HUNTER

113

1    Q. But by your letter it makes clear that you
2 knew the process of claims releases with DGA;
3 right?
4    A. I will show her how to release the claim.
5    Q. So that means you had done it before then?
6    A. I had done it twice.
7    Q. So at least twice --
8    A. Because there was nobody in there from
9 when Jeannie -- Jeannie needed to teach me too
10 because she was leaving, so I had to teach somebody
11 else how to do it.
12    Q. When you say -- what's a claims release?
13       What does that mean?
14    A. Just like I said before, you would get on
15 there and see that maybe for the week ending
16 2-18-03 there was $5,000 worth of bills.  So then
17 you would say release that week.
18    Q. What does it mean to release that week?
19       Release what?
20    A. To pay that, whatever bills were in that
21 week.
22    Q. Okay.  So at least in the -- toward the
23 end of April '05 you had been involved in at least
24 twice releasing money to pay off unpaid claims?
25    A. During April of '05?

114

1    Q. Yes.
2    A. Probably not in April of '05.
3    Q. When would you have done that twice
4 before?
5    A. I don't know.  It was probably later in
6 2004 with Jeannie because I didn't know how that
7 whole process was working.
8    Q. Right about the time you did the Asset
9 Purchase Agreement?
10    A. Yeah, so that, you know, she would know to
11 make sure that the money that was coming in, that
12 she would pay that and get that transferred out.
13    Q. And this was Jeannie Gilson?
14    A. Yes.
15    Q. Director of Human Resources?
16    A. Yes.
17    Q. And you worked with her at UOV to release
18 funds to DGA to pay off employee medical claims;
19 right?
20       MS. McARDLE:  Objection as to form.  I
21 think that misstates what her testimony is.
22       MR. VESSELS:  Okay.
23    A. I didn't work with her to do that.  You
24 know, she was teaching.  She knew how to do that.
25    Q. Okay.

115

1    A. and so I said, "How do you release a
2 claim?  I had no idea how you did that."
3    Q. You at least went to her and asked how
4 that happens?
5    A. Yes.  So then we released two weeks' of
6 claims so then I would know how that was done.
7    Q. This was in late December of '04?
8    A. Probably.  Well, it might have been even
9 before that.
10    Q. Did you -- after January 1st, '05, did you
11 check with Jeannie Gilson to see if that process
12 continued?
13    A. She came to me or she called me or left me
14 a note, I know there was something.  She was really
15 excited because there were a lot of claims that
16 were being paid.
17    Q. Did you ask how much?
18    A. I don't know where 70,000 comes into play,
19 but I think it was 70,000.  I knew of that.
20    Q. So at one point somewhere in that
21 January/February/March time frame --
22    A. That was probably January.
23    Q. January '05 Jeannie said 70,000 got paid
24 off?
25    A. I don't know if she said that amount, but

116

1 I know she was excited because some claims were
2 being paid.
3    Q. Did you ever hear from her after that
4 about any further big payoffs?
5    A. I don't remember.  I know we talked, you
6 know, but I can't be specific with that.
7    Q. Okay.  I want to show you what will be
8 Exhibit 9 now, which I will mark.  I've not made a
9 copy.
10       (Deposition Exhibit No. 9 was marked for
11       Identification.)
12       MR. VESSELS:
13    Q. I'll show it to your attorney first.
14       What is that letter?
15    A. This is when corporate came up and
16 terminated his Bridgeport franchise.
17    Q. Who is corporate?
18    A. The corporate office in Ft. Lauderdale,
19 Florida, the franchisor.
20    Q. The franchisor.  And what does the letter
21 say exactly?
22       Just go ahead and read it.
23    A. "Dear Employee, I regret to inform you
24 that today will be your last paycheck issued by
25 Interim Health Care of the Upper Ohio Valley, Inc.

DEPOSITION OF DIANE LYNN HUNTER

117

1  Your service to this organization and your patience
2  has been greatly appreciated.  The new owner of the
3  Interim franchise is Diane Hunter.  We encourage
4  'l employees to reapply with Interim Health Care
5  of SE Ohio, Inc., located on the first floor of
6  this building."
7      Q. Okay.  Now, I thought you testified
8  earlier that starting January 1st the employees at
9  your company, SEO, got paychecks from you; right?
10     A. Yes.
11     Q. Why would he send that letter that implies
12  that they were receiving payments from him?
13     MS. McARDLE:  Objection as to form.  There
14  is no foundation laid to which employees that went
15  to and which employees were SEO and which employees
16  were OUV.
17     MR. VESSELS:  Okay.
18     Q. Which employees did that go to?
19     A. Bridgeport.
20     Q. Just the Bridgeport?
21     A. Yes.
22     Q. Did not go to your employees?
23     A. No.
24     Q. At SEO?
25     A. No.

118

1      Q. That clarifies it for me.
2         On May 4th, 2005 do you know how much was
3  still unpaid for UOV's employee medical claims?
4      A. I know that there were still some claims
5  because I think Teri Brinkman had e-mailed me at
6  one time and I told her I didn't have anything to
7  do with the claims anymore.
8      Q. Right.
9      A. So I don't remember the amount.
10     Q. Did you know it was still in the $100,000
11  plus range?
12     A. I did not know that.
13     Q. Have you had any contact with Lance
14  Blankenship since then, May 4th, '05?
15     A. No.
16     Q. No phone calls?
17     A. Oh, he called -- no, he didn't call.  Oh,
18  he called me one time to say he was coming down the
19  hill to pick up his papers.
20     Q. What hill?
21     A. The hill from where he lived.
22     Q. In Bridgeport?
23     A. Yes.
24     Q. What papers?
25     A. He had wanted his taxes that he had left

119

1  there.  He asked the bank if he could have them, so
2  he was able to pick them up.
3      Q. Did he ever make any contact with you at
4  any point after May 4th, '05 involving the employee
5  medical plan?
6      A. No.
7      Q. Have you talked to Barbara Marshall since
8  May of '05?
9      A. I talked to her in June just to let her
10  know that I had his mail and I would drop off all
11  of the UOV stuff at her house so she could give it
12  to him.
13     Q. But nothing after that?
14     A. With Lance?
15     Q. No, with Barbara Marshall.
16     A. No.
17     Q. Or Lance Blankenship's wife?
18     A. She called my office once threatening one
19  of my employees, but I had my attorney write her a
20  letter to cut it out.
21     Q. Threatened which employees?
22     A. Dora McGovern.
23     Q. Threatening her as to how?
24     A. She wanted her to go up to the third floor
25  and see how much of his paperwork was still there

120

1  so they could figure out the size of the truck to
2  come and pick it up.
3      Q. How did she threaten her?
4      A. She said if he didn't do it she would be
5  testifying in court and there was all kind of --
6      Q. Have you had other legal actions or
7  lawsuits involving the Interim UOV and the Interim
8  SEO transfer?
9      A. Well, Lance Blankenship sued me.
10     Q. Okay.  When did he sue you?
11     A. November of '05.
12     Q. Why did he sue you?
13     A. Because the corporate office came and
14  terminated his franchise and I took over, so he was
15  suing me because he wanted money from me.
16     Q. Took over which franchise?
17     A. Bridgeport.
18     Q. So SEO now operates Brideport's
19  franchise?
20     A. Yes.
21     Q. And Marietta and Athens' market?
22     A. Yes.
23     Q. So currently SEO operates the exact same
24  franchise territory that UOV did in '04?
25     A. No.

DEPOSITION OF DIANE LYNN HUNTER

121

1    Q. Okay. What is missing?

2    A. West Virginia.

3    Q. Oh, okay. Where did he sue you?

4    A. Where?

5    Q. Yes. Which court?

6    A. Florida, down in Florida.

7    Q. Why did he sue you in Florida?

8    A. I don't know.

9        MS. McARDLE: Interim corporate sued Lance

10   Blankenship. Lance Blankenship brought Diane

11   Hunter in on a cross-claim.

12       MR. VESSELS: Okay.

13   Q. So Interim Health Care, the franchisor,

14   sued Lance Blankenship for some reason in Florida;

15   right?

16   A. Yes.

17   Q. And he filed a third-party complaint to

18   bring you into that lawsuit?

19   A. Yes.

20   Q. What did he allege in his lawsuit that you

21   did?

22   A. I didn't run the business he said. Gosh,

23   I don't remember. I'm just --

24   Q. If you remember. Again, the basic

25   instructions, if you don't remember, just let me

122

1    know.

2    A. I don't know. It was just --

3    Q. Is the lawsuit still going on?

4    A. No.

5    Q. Was it settled?

6    A. It was dropped.

7    Q. It was dismissed?

8        MS. McARDLE: We got it dismissed, yes.

9        MR. VESSELS: Okay.

10   Q. Have there been other legal actions by

11   agencies or other employees involving the UOV

12   obligations?

13   A. For the health?

14   Q. Health claims?

15   A. No.

16   Q. Sandra Schilling and Janet Boyce are it?

17   A. Yes.

18   Q. Did the other employees just let it go?

19   A. I haven't heard anything from them.

20   Q. What about Workers' Comp?

21   A. Workers' Comp, well, he still owes

22   Workers' Comp.

23   Q. He had not paid his Workers' Compensation

24   obligations to the State of Ohio?

25   A. Correct.

123

1    Q. How much were those?

2    A. I think that -- I believe they were

3    $200,000.

4    Q. How long had he not been paying his

5    Workers' Comp obligations?

6    A. I don't know.

7    Q. Did the Ohio Bureau of Workers'

8    Compensation try to get it out of you?

9    A. No.

10   Q. SEO?

11   A. Oh, out of me?

12   Q. Yes.

13   A. No.

14   Q. Or I mean out of SEO.

15   A. They said that I was a successor to the

16   company.

17   Q. Okay. That's what I'm getting at.

18   A. Okay.

19   Q. Did they sue you?

20   A. No.

21   Q. What happened?

22   A. I went to a hearing and appealed it and

23   they agreed with the decision that I was not a

24   successor.

25   Q. Never went to court though?

124

1    A. No.

2    Q. Any other lawsuits arising out of the

3    transition from UOV to SEO?

4    A. The only thing I do know is that he --

5    some companies, or the Steubenville tax people had

6    called and spoke to my husband and they were

7    looking for him to pay his tax. And I believe they

8    told him -- they told him, or somebody from --

9    where they were trying to collect for the 941's,

10   talked to my husband also and they told him that he

11   made his daughter a statutory agent.

12   Q. Okay. Did he owe other than Workers'

13   Comp, unemployment contributions?

14       Had he been paying those?

15   A. I don't know on the unemployment. I don't

16   know for sure.

17   Q. Where is he living now?

18   A. I assume he's living at Hideaway Lane at

19   Seneca Lake, his lake house.

20   Q. Here in Ohio?

21   A. In Ohio.

22       MR. VESSELS: I don't think I have any

23   further questions. Thank you.

24       THE DEPONENT: Okay.

25       MS. McARDLE: Do you want to read or do

125

1  you want to waive reading of the deposition?

2       It's up to you.

3       THE DEPONENT:  I'll read it.

        (The deposition of DIANE LYNN HUNTER was

5  concluded at 2:53 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

126

1       STATE OF WEST VIRGINIA, To-wit:

2       I, Regina L. Bryant, a Notary Public and Court

3  Reporter within and for the State aforesaid, duly

4  commissioned and qualified, do hereby certify that

5  the deposition of DIANE LYNN HUNTER was duly taken

6  by me and before me at the time and place specified

7  in the caption hereof.

8       I do further certify that said proceedings

9  were correctly taken by me in stenotype notes, that

10 the same were accurately transcribed out in full

11 and true record of the testimony given by said

12 witness.  I further certify that I am neither

13 attorney or counsel for nor related to or employed

14 by, any of the parties to the action in which these

15 proceedings were had, and further I am not a

16 relative or employee of any attorney or counsel

17 employed by the parties hereto or financially

18 interested in the action.

19      My commission expires the 7th day of October

20 2011.  Given under my hand and seal this 13th day

21 of November 2007.

22

23       ----------------------
         Regina L. Bryant
         Court Reporter, Notary Public

24

25